Argued and submitted December 19, 1994, reversed and remanded for entry of appropriate judgment September 6, petition for review denied November 28, 1995

(322 Or 361)

Don L. MONSON,
*Respondent,*

*v.*

STATE OF OREGON,
*Appellant,*

*and*

Jerry GREEN,
*Defendant.*

(16-92-05982; CA A81477)

901 P2d 904

Jas. Adams, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Harold D. Gillis argued the cause and filed the brief for respondent.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

DEITS, P. J.

## DEITS, P. J.

Plaintiff Don Monson brought this action for breach of contract against defendant State of Oregon, following plaintiff's removal as head men's basketball coach at the University of Oregon.[1] The jury found for plaintiff, and the state appeals. We reverse.

The material facts are undisputed. In 1978, plaintiff became head men's basketball coach at the University of Idaho. At that time, he had 17 years of high school coaching experience and two years of assistant coaching at the college level. In March 1983, after the conclusion of the 1982-83 basketball season, plaintiff met with officials of the University of Oregon about becoming the head men's basketball coach. He received a letter from the university's athletic director offering him the position of head basketball coach at a yearly salary of $52,000 plus potential earnings of $10,000 to $12,000 the first year for appearing on radio/television shows and potential additional earnings for running a summer basketball camp. The letter also mentioned other benefits, such as the use of courtesy cars and a complimentary country club membership. The letter specified that the offer was contingent on being ratified by the president of the university.

Plaintiff subsequently received a letter from the university's acting vice-president offering an appointment as head men's basketball coach. The offered position was a nontenure faculty appointment as an officer of administration with the rank of professor, for the period from March 23, 1983, through June 30, 1987.[2] The only provision regarding compensation specified a starting annual salary of $52,000. Plaintiff signed the contract.

On January 27, 1986, plaintiff signed a "Notice of Appointment and Contract," appointing him as an officer of

---

[1] The trial court dismissed with prejudice the action against Jerry Green, who was hired by the university to replace plaintiff as head men's basketball coach. A judgment of dismissal also was entered disposing of plaintiff's first claim for injunctive relief against the university.

[2] At trial, Dan Williams, the current vice-president of administration at the University of Oregon, testified that a coach is designated by the university as a professor, with all the rights and privileges of a faculty member, except for tenure and promotion.

administration, nontenure related, with the rank of professor and title of head men's basketball coach, for the period July 1, 1987, to June 30, 1990, at an annual salary of $60,000. In October 1988, plaintiff signed another "Notice of Appointment and Contract" for the period July 1, 1990, to June 30, 1992. Both contracts provided that

> "[the] position is subject to the provisions of the Oregon Administrative Rules of the Oregon State Board of Higher Education and to other now existing administrative rules, regulations and policies of the University of Oregon relating to Officers of Administration which are incorporated by reference herein."

In a letter to plaintiff, dated August 6, 1990, Bill Byrne, the university's then athletic director, informed plaintiff that he was doing an outstanding job and that, as a result, the university had agreed to extend his contract by two years through the 1994 basketball season. However, it was later discovered that the appropriate paperwork for the contract extension had never been completed. Dan Williams, the university's Vice-President of Administration, testified that neither he nor Byrne discovered the oversight until a local newspaper reporter sought to confirm that plaintiff's contract was to expire in 1992. Williams testified that, although plaintiff's removal from the position of basketball coach was already under consideration, he "executed the papers to fulfill that [earlier] promise." Accordingly, on January 24, 1992, plaintiff signed another "Notice of Appointment and Contract" for July 1, 1992, to June 30, 1994, at an annual salary of $79,468. As with the prior two contracts, plaintiff was appointed as an officer of administration, nontenure related, with the rank of professor and title of head men's basketball coach. The contract provided:

> "The position as offered is subject to all applicable provisions of State and Federal law, State administrative rules, and the regulations and policies of the State System of Higher Education and the University of Oregon."

Although none of his notices of appointment and contract mentioned outside income, plaintiff earned additional income during his employment through his summer basketball camp, through outside contracts with equipment sponsors such as Nike and Rawlings Sporting Goods, and

through contracts and other agreements involving television and radio companies, including those companies under contract with the university's Oregon Sports Network. Some of the contracts were arranged by the university, but all of the opportunities for outside income made available to plaintiff were in connection with his duties as head men's basketball coach. Plaintiff also was given a complimentary country club membership and, after the first year, the use of two new courtesy cars.

In early February 1992, plaintiff was advised by Byrne that Byrne was going to be inquiring into the financial packages offered to coaches at other schools, in the event of a change at the University of Oregon. Byrne explained that he had not yet decided whether to hire a new coach and that he would not talk to any other coaches before the end of the season, but that he did not want plaintiff to hear through rumors that Byrne was making inquiries. At the time of that discussion, the basketball season was half over. The team had opened the season with a 40-point loss to the University of Montana, a member of the Big Sky conference, which Byrne characterized as "much less significant" and "not comparable to the Pac-10 conference." The university had lost money in men's basketball the previous year, and attendance was down again.[3] Byrne also believed that the team's athletes were of a "lesser caliber than the teams that we were competing against," including opponents that were not in the Pac-10 conference.

Plaintiff met with Byrne again on March 17, 1992, after the basketball season had ended. At that time, Byrne explained that the basketball program was not going in the direction that he wanted and that he was reassigning plaintiff from basketball coach to golf coach. Plaintiff testified that he interpreted Byrne's concerns to be related to the program's finances and the team's win-loss record.[4] Plaintiff told Byrne

---

[3] Byrne explained that, because the athletic department receives virtually no state support, the department relies on income generated from the men's basketball and football programs to pay expenses such as salaries, scholarships, and operating costs of the facilities. He testified that all nonrevenue-generating sports teams also rely on the income from the men's program.

[4] Plaintiff's win-loss record as head coach at the University of Oregon was 116-145, with an average of 9 wins to 16 losses per season. In plaintiff's last four seasons, the record was 42-72, the worst overall record of any team in the Pac-10

that he was unwilling to be golf coach. At trial, plaintiff testified that accepting the position would have been "professional suicide." After his meeting with Byrne, plaintiff left the campus and never returned or attempted to contact the athletic director, the vice-president, or the president of the university.

Shortly after the meeting, plaintiff received a letter from Byrne, dated March 17, 1992, confirming their conversation of that date and formally reassigning plaintiff to head men's golf coach and fund raiser. The letter stated that the university would honor the terms of plaintiff's contract, but that a change in leadership was needed "for the good of the department." In a letter to plaintiff dated April 29, 1992, Byrne offered to reassign plaintiff to a position as the university's compliance coordinator for NCAA rules and regulations. Plaintiff testified that, as with the golf coach position, had he accepted that position, he would have never been able to get back into basketball coaching. After plaintiff failed to accept the new assignment by May 18, 1992, the university considered him to have resigned and paid him no further compensation. Plaintiff testified that, as of that date, he had no unfulfilled contracts or agreements for outside income.

In July 1992, plaintiff filed this breach of contract action. In his complaint, he alleged that he had signed written contracts employing him as head men's basketball coach through June 30, 1994, that he had performed all conditions of the contracts and that

"On or about March 18, 1992 the defendant State of Oregon discharged plaintiff as coach at the University of Oregon to plaintiff's damage in the sum of $178,936.92 together with the sum of $221,066.00 as the value of the money and benefits plaintiff would have received from non-public sources if he remained in the position as coach, and together with the sum of $25,785.60 for the medical, dental and retirement benefits included within the contract but which

Conference. In his final season, the team lost 21 games. Two of those losses were by margins of approximately 50 points — one was the worst loss in 90 years for the University of Oregon men's team, the other was the worst home loss ever by a men's basketball team. The average attendance for home games had dropped from approximately 8,500 during his first season as coach to approximately 6,000 during his last season.

benefits have been terminated, and all for which plaintiff demands judgment against defendant State of Oregon."

Among other defenses raised in its answer, the state asserted that plaintiff was advised that his duties within the Athletic Department were being reassigned, and that plaintiff's reassignment from his position as head basketball coach was authorized under the terms of plaintiff's contract.

At the close of plaintiff's evidence, the state moved for directed verdict "on three points":

"The first is that the university had a contractual right to reassign plaintiff from his position as men's head basketball coach. The second point is that the university validly exercised that right to reassign. And the third point is that plaintiff has demonstrated no contractual entitlement to receive from the university any of what's been referred to in this case as outside income."

The motion was denied, as was the state's renewed motion for directed verdict at the close of all of the evidence. The jury found for plaintiff and awarded him $292,087.83 in damages. On appeal, the state assigns as error the court's denial of its motions for directed verdict.

A directed verdict is appropriate when there is a complete absence of proof on an essential issue, or when there is no conflict in the evidence and it is susceptible of only one construction. *Denly v. Mutual of Omaha*, 251 Or 333, 336, 445 P2d 505 (1968); *Adams v. Knoth*, 102 Or App 238, 242, 794 P2d 796, *rev den* 310 Or 422 (1990). In reviewing the denial of a motion for directed verdict, we consider the whole record, including defendant's evidence. *Scholes v. Sipco Services & Marine, Inc.*, 103 Or App 503, 506, 798 P2d 694 (1990). We view the evidence in the light most favorable to plaintiff, the nonmoving party, and will reverse only if there is no evidence from which the jury could have found that the state breached the contract. *See Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *Sivers v. R & F Capital Corp.*, 123 Or App 35, 37, 858 P2d 895 (1993), *rev den* 318 Or 351 (1994).

Although there was some dispute at trial on these matters, the parties now appear to agree that, at the time the dispute arose, the only agreements in force between the state

and plaintiff were the Notice of Appointment and Contract expiring in 1992 and the Notice of Appointment and Contract expiring in 1994. The parties also agree that both of those agreements incorporated by reference all state administrative rules, including those pertaining to sanctions and to personnel actions that are not for cause. *See Garrett v. State Farm Mutual Ins. Co.*, 112 Or App 539, 544, 829 P2d 713, *rev den* 313 Or 627 (1992) ("When a written contract refers in specific terms to another writing, the other writing is part of the contract."). Finally, the parties agree that the university reassigned plaintiff from his duties as head coach of the men's basketball team.[5]

■ The state contends that what plaintiff asserts was his contractual "right" to retain the duties of head men's basketball coach was subject to the university's contractual right to reassign personnel. Thus, the state argues that, as a matter of law, the exercise of its right to reassign in a manner consistent with the applicable administrative rules cannot constitute a breach of plaintiff's contract. The university specifically relies on OAR 580-21-318, which, as noted above, the parties agree was incorporated by reference into the contract:

"As authorized by statute and by authority delegated to the Chancellor and the institution presidents, *personnel may be transferred or reassigned within an institution in accordance with the staff needs of the institution* or other units. Such personnel action should not be considered sanctions for cause unless they result from actions described in OAR 580-21-325."[6] (Emphasis supplied.)

---

[5] Plaintiff does not contend that he was discharged from employment with the university or that his removal from head coach was calculated to force him to resign. In fact, he testified that, in his mind, the university believed that it was acting pursuant to the contract. When asked on direct examination whether he looked at the job of golf coach or rules coordinator "as a job intended to humiliate" him, plaintiff responded:

"I don't know about humiliating me. I think it was something that fulfilled trying to tell me that they had a contract with me and they were trying to fulfill it, and this was something that they could [do to] meet that particular commitment."

[6] Under OAR 580-21-325(1)(c), "cause" includes the "[f]ailure to perform the responsibilities of an academic staff member." Evidence to demonstrate cause under that standard includes evidence of incompetence, gross inefficiency, or intentional or habitual neglect of duty. OAR 580-21-325(2).

OAR 520-21-320 provides that a nontenured academic staff member may be removed from an assigned post and reassigned as a sanction for cause, but that such a

The state contends that plaintiff was reassigned pursuant to OAR 580-21-318. It asserts that the evidence demonstrates that the university decided that plaintiff was no longer the best person for the job of head men's basketball coach and, based on its assessment of its staff needs, the university had the authority, under the rule, to reassign plaintiff to other duties within the athletic department. In support of its position, the state relies on evidence that during plaintiff's last four seasons as head coach, the team had the worst record in the Pac-10 conference, that the players whom plaintiff had recruited were academically and athletically inferior to those of conference and nonconference opponents, that the average home-game attendance figures had dropped, and that the income generated by the basketball program, on which the entire athletic department depends, had declined. *See* note 4 above. The evidence also showed that, based on the recommendations of then Athletic Director Byrne and Vice-President Williams, which included their view that plaintiff could not effectuate a turn-around in the program, University President Myles Brand made the decision to reassign plaintiff's duties, pursuant to OAR 580-21-318. In the letter informing plaintiff of the change, Byrne stated that "for the good of the department we need to make a change in leadership in the men's basketball program."

The trial court's denial of the state's motions for directed verdict appears to have been based, at least in part, on the court's view that the reassignment could not have been in accordance with the "staff needs" of the university because the positions to which plaintiff was to be reassigned were not vacant. The court explained:

> "If the plaintiff has a burden of disproving that the reassignment from head basketball coach to golf coach thence to rules coordinator, the move was not proper to those positions, the testimony shows * * * that there was a golf coach, at least for the previous season, and no indication that that assignment had been changed or that there was a vacancy and a need to staff that position, even to the extent of transferring the head basketball coach from his position in mid-season to being coach for the golf team.

sanction must be imposed in accordance with the contested case procedures in OAR 580-21-325 through OAR 580-21-385.

"There's testimony from [plaintiff] that that position was already occupied or that one occupied was never filled by persons of his rank and stature in the athletic department. And similarly, there is testimony that the duties of monitoring and coordinating compliance with NCAA rules had been discharged as only a parcel of the duties of persons assigned to other categories of employment and discharged as part of their duties in those assignments.

"Consequently, *there is evidence which, if believed by the jury, would leave them to conclude that the transfer, although within the institution, and although done by a person with authority to make the transfer, was not predicated upon the staff needs of the institution* or some other unit of the institution.

"That is sufficient to save that issue from a motion to dismiss." (Emphasis supplied.)

The court also commented that "the only testimony before the jury is that the transfer was to positions already fulfilled or filled by full-time or part-time staff members within the department."

The state argues that the trial court was both factually and legally mistaken in its ruling. We agree. First, contrary to the trial court's summary of the evidence, the only testimony about the golf coach position came from plaintiff, who stated that he did *not* think there was a golf coach at the time that Byrne reassigned him to that position. Rather, he believed that the position had been vacant for some time, but for less than a year. The undisputed evidence also showed that plaintiff's reassignment occurred at the end of the basketball season, not in "mid-season."

More significantly, however, the trial court apparently assumed that "the staff needs of the institution" under OAR 580-21-318 meant only that there is "a vacancy and a need to staff" a particular position. Thus, according to the trial court, evidence showing that the duties of golf coach or compliance officer were being performed by other staff members could support a finding that the reassignment of plaintiff to those positions was not in accordance with the university's "staff needs."

■■ We do not agree with the court's narrow interpretation of the university's authority under the rule. Although

this is a breach of contract action, the meaning of the administrative rule at issue here is a question of law for the court.[7] *See State v. Acosta*, 112 Or App 191, 195, 827 P2d 1368 (1992). Our task in interpreting a statute or a regulation is to determine the intent of the body that promulgated it; in this case, the State Board of Higher Education. *See Perlenfein and Perlenfein*, 316 Or 16, 20, 848 P2d 604 (1993). We begin with the language of the regulation, including relevant rules of statutory construction. One such rule is that words of common usage that are not defined in the statute typically are to be given their plain, natural and ordinary meaning.

The critical terms of the rule here, "staff needs," are not defined in the Board of Higher Education's administrative rules. Accordingly, we look to the common usage of those terms. Generally, the noun "need" means "a want of something requisite, desirable, or useful." *Webster's Third New International Dictionary* 1512 (Unabridged 1976). The adjective "staff" means "of, relating to, or constituting a staff," which, in turn, is defined as "the personnel responsible for the functioning of an institution or the establishment or the carrying out of an assigned task * * *." *Id*. at 2219. Thus, in common usage, an institution's "staff needs" are the those things that are necessary, useful, or desirable with regards to the group of staff members on which the university depends for its general operation. Examples of an institution's staff needs would include not just an interest in filling vacant positions but also an interest in making the best use of available staff members.

Consideration of other rules of the university is also helpful in determining its meaning. It is apparent from the rules that the institution's administration has significant discretion to determine what is necessary, useful, or desirable, in terms of managing its staff. Under OAR 580-21-390, "[a]n academic staff member aggrieved by a president's non-disciplinary personnel decision may appeal such decision" to

---

[7] Because this a breach of contract action, we also do not have the benefit of the agency's interpretation of its own rule, as we would if we were reviewing an administrative decision. At trial, the state attempted to present evidence regarding "the agency's interpretation" of OAR 580-21-318. However, the court sustained plaintiff's objection to the testimony of Melinda Grier, the director of legal services and compliance officer for the State Board of Higher Education, and the state does not assign that ruling as error.

the Board. Thus, an employee who has been reassigned under the authority of OAR 580-21-318 may request review of that decision. If the Board exercises its discretion to take further action on the personnel decision, the review will include a "fair consideration of the facts," but it "shall not include a *de novo* review on the judgment exercised by the president." OAR 580-21-390(5).

We conclude that, with respect to nontenured faculty members subject to the rule, the university has the authority to reassign individuals based on its assessment of its overall staffing needs. Just as the institution's interest in filling a vacant position may justify reassigning a staff member, so too might the administration's determination that a staff member is no longer the most effective person for a particular position, or a determination that a department would be better served by having a different staff member in that position.[8]

The issue raised by the state's directed verdict motions was whether a reasonable jury could have found that plaintiff's reassignment from his position as head men's basketball coach was inconsistent with the administrative rules governing reassignment. We conclude there was no evidence from which a jury could have made that finding. The essence of plaintiff's argument on appeal is that, because the evidence "suggested that plaintiff's removal as coach was for 'cause,' " it follows that his removal could not have been based on a decision to reassign him under OAR 580-21-318.[9] He argues:

---

[8] We emphasize the point, suggested in the text, that our interpretation of OAR 580-21-318 and the related rules we discuss applies only to plaintiff and to employees who are in positions or classifications that are essentially identical to his. In particular, we imply no conclusion regarding how the rules might apply, if at all, to tenured faculty, employees in various represented bargaining units or other employees of the institution whose positions differ in material ways from plaintiff's. We are not apprised by the parties whether OAR 580-21-318 applies to those other employees at all, or whether other rules, which do not apply to plaintiff, might also apply to them and affect the way in which OAR 580-21-318 operates, standing by itself. More fundamentally, the job descriptions and job incidents of those other employees could constitute part of the context of OAR 580-21-318 as it might apply to them, and could lead to different conclusions in those contexts than the one we reach here about the effect and operation of the rule in this particular and possibly very different context. None of those matters need to be decided here, and we emphasize that they are not decided here.

[9] Although plaintiff offered numerous challenges to the state's evidence and theories at trial, including that OAR 580-21-318 did not apply to his contract, plaintiff has abandoned most of those arguments on appeal.

"The administrative rule the State claims it was relying on to reassign [plaintiff] requires only a consideration of 'staff needs', OAR 580-21-318. If plaintiff had been a history professor, rather than a coach, one might conclude the State was trying to show his gross deficiencies as a history teacher in order to reassign him 'for cause' under OAR 580-21-320. The court will find nothing in the record induced from plaintiff's end that prompted the State's attack on [plaintiff] as a coach and as a financial failure for the University. * * *

"The State offered during plaintiff's case in chief and in its own case evidence that falls within the 'cause' standards of OAR 580-21-325: Incompetence, gross inefficiency or intentional or habitual neglect of duty. While [plaintiff's] superior was filing evaluations that rated him outstanding, other University personnel who testified did so negatively about his record and how much money the University was losing. And his superior, the athletic director, began considering removal of [plaintiff] at the start of the 1991-92 season."[10]

Plaintiff's argument, however, does not defeat a motion for a directed verdict. First, even if the evidence did suggest that plaintiff was reassigned for "cause" from his coaching position, it does not follow that the decision to reassign him was not in accordance with staff needs. The evidence concerning plaintiff's performance, and the effect of that performance on the university's athletic program, is also pertinent to the question of whether a reassignment is consistent with "staff needs." As discussed above, the assessment of an institution's overall staffing needs includes an evaluation of how best to make use of available staff members. That inquiry requires an assessment of the strengths and abilities of the individual staff members. A determination that an employee's skills are no longer compatible with the changing needs of his or her position, does not necessarily mean that

---

[10] Elsewhere in his brief, plaintiff argues:

"The State asserts that 'performance considerations' short of supporting sanctions for cause are relevant and that the University was entitled to consider [plaintiff] was no longer the best person as coach and assign him away from that position. * * * Under the view expressed in the State's brief the president of the University could be reassigned to the University heating plant to stoke the boilers based on performance considerations short of sanctions for cause — even though the real reason was one of those listed in OAR 580-21-325(2) as the cause for reassignment."

that employee is incompetent, grossly inefficient, intentionally or habitually neglecting his or her duty, or in any other way "failing to perform the responsibilities of an academic staff member." *See* OAR 580-21-325 (relating to sanctions for cause). Accordingly, the fact that the university's decision to reassign plaintiff was based in part on his performance as head men's basketball coach, does not controvert the evidence that the reassignment was "in accordance with the staff needs of the university."

Plaintiff has failed to identify any evidence in the record from which a jury could find that his reassignment from his position as head men's basketball coach was not in accordance with the applicable administrative rules. Accordingly, viewing the evidence in the light most favorable to plaintiff and giving him the benefit of all reasonable inferences, we conclude that a jury could not have found the facts necessary to conclude that the university breached plaintiff's contract. Accordingly, the trial court erred in not directing a verdict in the state's favor.[11]

Reversed and remanded for entry of appropriate judgment.

---

[11] Because there was no breach of contract, we need not address the state's alternative argument that plaintiff is precluded from recovering the loss of outside income.