Argued and submitted May 20, 2003, appeal from amended opinion and order
concerning attorney fees dismissed; otherwise affirmed May 12, 2004

## IRON HORSE ENGINEERING CO., INC.,
### a Florida corporation,
### *Respondent,*

*v.*

## NORTHWEST RUBBER EXTRUDERS, INC.,
### an Oregon corporation,
### *Appellant.*

## NORTHWEST RUBBER EXTRUDERS, INC.,
### an Oregon corporation,
### *Counterclaim Plaintiff,*

*v.*

## IRON HORSE ENGINEERING CO., INC.,
### a Florida corporation,
### *Counterclaim Defendant.*

### 0002-01794; A115936

89 P3d 1249

Thomas J. Murphy argued the cause for appellant. With him on the briefs was Scott Hookland LLP.

James N. Westwood argued the cause for respondent. With him on the brief were Stoel Rives LLP, Julie R. Vacura and Larkins Vacura LLP, and Judy D. Snyder and Hoevett Snyder & Boise, PC.

Before Linder, Presiding Judge, and Wollheim, Judge, and Barron, Judge pro tempore.

WOLLHEIM, J.

Barron, J. pro tempore, concurring.

## WOLLHEIM, J.

This action arises out of a contract involving "rail boot" for the Portland Streetcar Project (the project). "Rail boot" is a rubber cover that is placed around streetcar rail tracks that are embedded in pavement. Appellant Northwest Rubber Extruders, Inc. (Northwest) is a rubber and plastic company that manufactures rail boot through a process called "extrusion." Respondent Iron Horse Engineering Co., Inc. (Iron Horse) develops designs for rail boot. In this case, Iron Horse and Northwest agreed to work together to provide rail boot for the project but negotiations failed and this contract action ensued, with each party making claims against the other.

Northwest argues that the trial court erred when it (1) denied Northwest's motions for a directed verdict, judgment notwithstanding the verdict (JNOV), and a new trial regarding Iron Horse's breach of contract claim; (2) gave a legally incorrect response to a written question that the jury asked during deliberations without first notifying counsel; (3) denied Northwest's motions for judgment on the pleadings, a directed verdict, JNOV, and a new trial regarding Iron Horse's claim for breach of the covenant of good faith and fair dealing; and (4) denied Northwest's request for attorney fees regarding Iron Horse's claim for misappropriation of trade secrets. We state the evidence in the light most favorable to the prevailing party before the jury. *Jensen v. Medley*, 336 Or 222, 226, 82 P3d 149 (2003).

In the business of rail boot design and extrusion, a design company, such as Iron Horse, approaches a manufacturing company about a particular project. Iron Horse's rail boot designs are also referred to as "tooling" or "rail boot technology." Iron Horse designs the "die" for the rail boot.

Before working with Northwest, Iron Horse worked almost exclusively with Montville Plastic (Montville), a manufacturing company. In its normal course of business, Iron Horse would approach Montville with specifications for particular products. Montville would then give Iron Horse a price quotation for the tooling and the actual production process. Once Iron Horse accepted the price quotation, Iron Horse

would give Montville a purchase order to manufacture the die and the boot. Montville would then manufacture the die and produce a "first article," which is the first product that meets all of the designer's specifications. The first article would then be sent to Iron Horse for approval and, once the article was approved, Iron Horse would sell it to its customer. The die created for Iron Horse would remain in Montville's physical possession, although Montville did not use Iron Horse's die for its own use or for the use of Montville's other customers. Rather, Montville would keep the die for the exclusive use of Iron Horse.

William Moorhead was head of Iron Horse.[1] Moorhead first came into contact with Northwest and its owner, Joseph Lucas, when Iron Horse entered into an agreement with a general contractor, Stacy & Witbeck, to supply rail boot materials for a project in Hillsboro. Stacy & Witbeck asked Iron Horse to route the contract through Northwest because Northwest was a "disadvantaged business enterprise" (DBE), and Iron Horse complied with that request.

After the Hillsboro project, Iron Horse asked Northwest for a price quotation for a project in Salt Lake City. Northwest quoted Iron Horse an acceptable price, and Iron Horse placed an initial purchase order with Northwest while Northwest was building the tool for the die that would eventually produce the rail boot. Northwest sent Iron Horse a first article, and Iron Horse paid Northwest for the die and the product. The die remained at Northwest's plant for Iron Horse's exclusive use.

After the Salt Lake City project, Iron Horse and Northwest entered into negotiations regarding the project that gave rise to this action. Iron Horse had approached both Montville and Northwest about the project. Stacy & Witbeck, the general contractor on the project, was concerned about meeting its DBE goals, so it wanted Iron Horse to work with Northwest on the project. However, Northwest did not have the "dual durometer capability" that the project required. Dual durometer capability means that the project required both "big boot" and "little boot" material. Montville, however,

---

[1] After this action ensued, Moorhead sold Iron Horse to Montville.

did have dual durometer capability. Both Northwest and Montville ended up agreeing to work with Iron Horse on the project.[2]

Eventually, Lucas, on behalf of Northwest, and Moorhead, on behalf of Iron Horse entered into an agreement that Moorhead put into writing and faxed to Lucas on March 9, 1999.[3] The fax detailed both the items that would be supplied for the job and the pricing. The fax also reflected the fact that, because Northwest did not have dual durometer capability, it would rent the little boot tooling from Iron Horse. Iron Horse's little boot tooling was in Montville's physical possession, so Iron Horse and Northwest agreed that Montville would need to ship the die to Northwest.

The fax also detailed Iron Horse and Northwest's agreements regarding "accessory items" that Iron Horse would supply. Moorhead explained that accessory items "are those items that we furnish as part of the contract that are necessary for putting in the complete rail boot system." Iron Horse would also pay any freight and storage charges. The fax concluded with the following:

"AS WE DISCUSSED ON THE PHONE[,] THERE WILL, OF COURSE, HAVE TO BE A CONFIDENTIALITY AGREEMENT/TECHNOLOGY SHARE AGREEMENT AMONG [NORTHWEST], [IRON HORSE], & MONTVILLE."

After the fax was sent and both parties had agreed to its terms, a draft confidentiality agreement was sent to Lucas, but Lucas did not sign the agreement. Rather, Lucas sent Iron Horse a second, different confidentiality agreement. Moorhead testified that the second agreement did not satisfy Montville's confidentiality concerns, so the second agreement was never signed by either party.

In April 1999, Lucas visited Montville's plant to observe the little boot die in operation so that Northwest would be "prepared for whatever we needed for the * * * equipment, any specific things that we didn't have in place we would have in place." Once there, Northwest entered into

---

[2] Montville is not a party in this action.

[3] A copy of the March 9, 1999, fax is set out in Appendix A.

an oral agreement with Montville and Iron Horse that North-west would build its own dual extrusion tool. Lucas testified that the purpose of this agreement was

> "to demonstrate our technical ability to be able to do so so that [Don Hofstetter, head of Montville,] can feel more comfortable moving his tool to us. I fully understood his concerns, that if we had a tool that was specialized in our shop, I would be very reluctant to send it out to someone that didn't have the same technology."

Moorhead suggested that Northwest make the big boot die, and Lucas agreed. Moorhead told Lucas that, when he returned to his office, Moorhead would send Lucas the designs so that Northwest could begin making the die. Moorhead said, "I thought I was ordering a die and going to order a profile the same way we normally had." While they were still at the Montville plant, Moorhead asked Lucas for a price quote, but he did not receive one that day.

Moorhead and Lucas discussed future projects that they could work on together that would require the use of the big boot die that Northwest had agreed to make. When Moorhead returned to his office, he faxed Lucas the designs and then sent them to Lucas via Federal Express. In his fax, Moorhead again asked Lucas for a price quote, but he did not receive one. Moorhead said that the fax also requested that Northwest make enough big boot for the project and "an additional quantity * * * that we would put in inventory, which meant I would pay him for storing it * * * because we had some impending business with other customers who might buy that [boot]." Northwest sent Iron Horse a first article, the first article approval form, and Iron Horse's designs.

On September 17, 1999, a third confidentiality agreement was drafted by Iron Horse. Moorhead testified that, before the third agreement was sent to Northwest, it was sent to Hofstetter, who said that the agreement was "not very strong but if that's the best we can do, we will go with this and that he would send the tool based on [Lucas] signing this agreement."

Lucas did not sign the third agreement and, instead, sent Hofstetter a fourth confidentiality agreement with a fax cover sheet dated September 22, 1999. Moorhead received a

copy, as well. The fourth agreement was not acceptable to Hofstetter or Moorhead because, according to Moorhead, "it didn't provide any real protection for * * * Iron Horse and Montville because it had terms in it that said that any information that Northwest already had was not considered confidential." The fourth agreement was not signed by either party.

On October 4, 1999, Northwest sent Iron Horse a letter stating, in part:

"[T]his correspondence constitutes a demand that:

"1. [Iron Horse] deliver all the required Tooling to [Northwest] * * * TIME IS OF THE ESSENCE; and

"2. That [Northwest] receive, in writing, with your assurance * * * that all the required Tooling will be shipped * * *. TIME IS OF THE ESSENCE.

"Given the construction schedule of the Project, the necessity to properly sequence the work, and the significant time period required for [Northwest] to manufacture its own tooling[,] it is imperative that you strictly comply with the time periods set forth in this demand. Unless [Northwest] has possession of your assurance and the Tooling as outlined here, your company will be in breach and [Northwest] will take such steps it deems appropriate to protect its interests. As you are well aware, given the status of the Project, if [Northwest] is forced to proceed without the Tooling its costs will be substantial as will its associated potential liability incidental and consequential damages.

"First, there is a large differential between the funds [Northwest] would receive if it were manufacturing the rail boot, and that it would receive if [Iron Horse] manufactures the rail boot. [Northwest] reserves the right to offset this differential from the funds [that] might otherwise be due to [Iron Horse].

"Second, and more importantly, [Iron Horse's] failure to deliver the tooling has already put [Northwest] in peril for significant liability because [Iron Horse] did not timely provide the Tooling. Clearly, if the Tooling is not provided at all, the potential for liability increases dramatically while the Project waits for goods required to keep the Project on schedule. [Northwest] simply cannot take this risk.

"Therefore, unless [Iron Horse] strictly complies with this demand, [Northwest] will obtain and confirm the specification for the Project's rail boot and manufacture the tooling required for [Northwest] to [fulfill] its obligations to the Project without the use of [Iron Horse's] tooling. If you force [Northwest] to take this course of action, [Northwest] will deduct all additional damages and expenses (except the cost for making the tooling which will be [Northwest's] property) from any funds which might otherwise be due to [Iron Horse].

"I realize that confidentiality of proprietary technology is an issue for [Iron Horse] and its supplier Montville. [Northwest] has always been—and remains—ready to sign a confidentiality/technology share agreement[ ] with Montville and/or [Iron Horse] which permit[s] [Northwest's] use of the Tooling. Yet, the agreements proposed to date by Montville/[Iron Horse] go well beyond [Northwest's] understanding of, and the terms of our agreement. In turn, we have received no substantive response to the proposals submitted by [Northwest]."

The day after he received Northwest's letter, Moorhead went to Lucas's office. Lucas told Moorhead that Northwest had already made a tool for the big boot and that Northwest did not use Iron Horse's designs in order to do so. Moorhead testified that he was "astonished" to hear this. Lucas and Moorhead then went to the office of Lucas's attorney, Michael Scott, with the intention of drafting a fifth confidentiality agreement, with Scott "redlining" the agreement and marking out parts that were unacceptable to the parties. Moorhead said that, by the end of the meeting, the parties had come to an agreement. Montville was not a part of this meeting because Moorhead said that "Hofstetter said * * * You do what you want to. If it's going to make it easy for you to deal with these people, then leave Montville out of it. I'll send the tool if you say to send the tool." Moorhead did not take a copy of the redlined version of the draft confidentiality agreement with him when he left Scott's office.

Moorhead said that, after meeting in Scott's office, Moorhead told Hofstetter about his conversation with Lucas and that Hofstetter's "reaction was I told you so. He wants to be your competitor. He's going to be your competitor." Moorhead said that he had suspicions that Northwest

wanted to compete against Iron Horse "when the big boot die was running and finished and I hadn't received any [price] quote * * *."

Lucas sent Moorhead a fax with a cover sheet dated October 6, 1999. The cover sheet said that enclosed was a copy of the redline draft agreement that was discussed at Scott's office. However, Moorhead said that the agreement did not reflect what he had agreed to in Scott's office. Moorhead wanted a portion of the agreement deleted that had survived the redlined version. That portion of the agreement provided, in part, that "this Agreement shall not apply to and the following shall not be construed as Confidential Information: (1). Any information now known to a party[.]"

Moorhead took the fifth confidentiality agreement to his attorney on October 7, 1999. Moorhead said that his attorney's reaction "was 'if you want to sign this you can, but there's nothing in it for you. There was no confidentiality protection for you in this.' "

On approximately October 12, 1999, Lucas telephoned Moorhead and informed Moorhead that the tooling had not yet arrived. Moorhead testified that he told Lucas that he had not sent the tooling because "I'm still not happy with this agreement. But I also asked him, What are you going to do about that * * * big boot tool? He says, I've decided to keep it. I told him, I'm not sending any more tooling then." Moorhead testified that he did not send the tooling because Lucas

> "had not followed what I thought was our contract, which was ordering a tool and ordering materials; * * * he's taking our information, made a tool and now he's going to keep it and use it for his own purposes and I wasn't going to send another tool out there for two reasons.
>
> "One, I didn't want him to have it; and two, once he got it in his shop, I might never get it back * * *."

On October 15, 1999, Scott sent Iron Horse a letter accusing Iron Horse of breaching the contract and notifying Iron Horse of Northwest's intentions. That letter stated, in part:

"Northwest expressly directs you to stop the further manufacturing and delivery of additional [little] rail boot to the Project. As you know, your company's failure to deliver the Tooling previously caused a product shortfall and your company manufactured and delivered product in excess of that required by your agreement. This was an attempt to mitigate our client's damages. Our client does not accept the manufacturing or delivery of excess product as a full or final resolution of any of its claims. It has and will continue to suffer damages.

"With full reservation of its rights, Northwest intends to use all the product previously delivered to the Project (including the excess product) and to manufacture the required remaining product with its own tooling. Understand, that this tooling will be Northwest's own property and that while Northwest will deduct and offset all damages it has and will incur related to your company's conduct it will not deduct the cost for making the tooling."

Moorhead said that there was no reason for Northwest to act so hastily and attempt to finish the project on its own because,

"by the time this letter was written we had furnished the 20,000 feet of little boot that we were required to under the purchase order. We had also shipped an additional 10,000 feet to keep the job going, at that point not knowing whether we'd get paid for it or not, so that the job was covered for material * * * through the first two weeks of January 2000, according to Stacy & Witbeck."

Moorhead explained that he sent the extra 10,000 feet of rail boot to Stacy & Witbeck "[b]ecause it was going to cost Stacy & Witbeck a ton of money if they had to shut the job down." Additionally, he was concerned because "Stacy & Witbeck in my mind was my customer, was my deal. They bought the stuff from us and I had a responsibility to keep this job going."

On October 25, 1999, David Ondrey, Iron Horse's attorney, sent a letter to Scott that stated, in part:

"Iron Horse's refusal to supply Northwest the tooling is predicated on your client's refusal to execute an appropriate

confidentiality agreement which was a condition of the original agreement. * * * It is my understanding [that] Northwest has made it clear to [Moorhead] that Northwest is not only unwilling to recognize Iron Horse's proprietary interest in such product, Northwest is apparently willing and able to misappropriate this confidential and proprietary information for Northwest's own benefit and use. Thus, sending Northwest further tooling * * * would only expose Iron Horse to further damages.

"* * * Iron Horse specifically disputes [Lucas's] claims that Northwest has developed the tooling * * * on its own, without help or input from Iron Horse. Indeed, [Moorhead] has provided me with copies of various proprietary and confidential documents which Iron Horse provided directly to Northwest solely to facilitate the Stacy [&] Whitbeck contract. These documents demonstrate * * * the product Northwest now claims as its own is in fact the identical product designed and formulated by Iron Horse (after considerable research, effort, and expenses). Indeed, [Moorhead] is aware of a certain modification made to the product and incorporated by Northwest which [Moorhead] himself designed and no one else has ever duplicated.

"These documents to which I refer were provided by Iron Horse to Northwest solely to enable Northwest to demonstrate it had the capability to produce the * * * product; it is most disturbing to realize that Northwest now intends to misappropriate that confidential information and use it for its own purposes.

"* * * * *

"In order to avert any problems for Stacy [&] Whitbeck, Iron Horse is prepared to ship the balance of the * * * product and the other components associated with the agreement (other than the tooling). However, because of Northwest's written threats to withhold funds due Iron Horse for both product already produced and shipped and product yet to be shipped, this arrangement must be conditioned upon Northwest's agreement to prepay for such remaining materials * * *. * * * What Iron Horse will not do * * * is ship the tooling for the * * * product, for the reasons outlined above."

On February 23, 2000, Iron Horse filed this action, alleging that Northwest's threatened use of the rail boot technology was a breach of fiduciary duty or a breach of the duty

of good faith and fair dealing. It also alleged that Northwest's threat to use the rail boot technology for projects other than the Portland Streetcar Project was a threatened misappropriation of trade secrets. The complaint sought injunctive relief, costs, disbursements, attorney fees, and further just and equitable relief.

Northwest counterclaimed, alleging that Iron Horse had breached its covenant of good faith and fair dealing and praying for costs and disbursements for production of the rail boot and building the extrusion tooling. Northwest also sought attorney fees and further just and equitable relief. Northwest then moved for summary judgment on Iron Horse's allegation of misappropriation of trade secrets. It also filed amended counterclaims, alleging breach of the covenant of good faith and fair dealing due to Iron Horse's failure timely to deliver the extrusion tooling and rail boot to Northwest. It also alleged that Iron Horse's claim for trade secret misappropriation was made in bad faith.

Iron Horse conceded Northwest's motion for summary judgment on Iron Horse's claim for relief for misappropriation of trade secrets and, on April 23, 2001, the trial court granted Northwest's motion.

Iron Horse then filed amended and second amended complaints, alleging breach of contract and breach of the covenant of good faith and fair dealing. Subsequently, Northwest filed a petition for attorney fees, alleging that Iron Horse had maintained a bad faith claim for trade secret misappropriation. Northwest also filed its answer to Iron Horse's second amended complaint, counterclaiming for breach of contract and attorney fees incurred in defending against Iron Horse's claim for misappropriation of trade secrets. Northwest's answer further included counterclaims for breach of the covenant of good faith and fair dealing, fraud, and bad faith claim of trade secret misappropriation. Northwest also filed a motion for partial judgment on the pleadings, alleging that Iron Horse had failed affirmatively to state a claim for relief when it alleged that Northwest breached the covenant of good faith and fair dealing. Before trial, the trial court declined to address the motion for partial judgment on the

pleadings and noted that it would address Northwest's motion later, if necessary.

A jury trial began on May 14, 2001. At the close of Iron Horse's case-in-chief, Northwest moved for a directed verdict with respect to Iron Horse's claims for breach of contract and breach of the covenant of good faith and fair dealing. The trial court denied Northwest's motion.

On May 17, 2001, after the case was submitted to the jury and during deliberations, the jury delivered a note to the trial judge, asking:

"(1)  Can we please get instructions from Judge (Tape recorded)

"(2)  Can we decide that they both bre[a]ched the contract or do we have to establish which bre[a]ched first?"

The trial court judge circled the portion of the question asking "Can we decide that they both bre[a]ched the contract" and drew a line from that portion of the question down to the bottom of the page where the judge wrote, "Yes." The judge signed and dated the note and, also at the bottom of the page, wrote, "PS - Please save this note." The note was routed back to the jury.

That same day, the jury returned with its verdict. The jury found that both Northwest and Iron Horse had breached the contract and that Iron Horse was entitled to exclusive use of both the little boot and big boot die. It further found that Northwest had breached the covenant of good faith and fair dealing. After the jury had been discharged and its verdict was received, the trial court informed the parties of the jury's written question.

In its first assignment of error, Northwest argues that the trial court erred when it denied Northwest's motions for a directed verdict, JNOV, and a new trial. Northwest contends that Iron Horse failed to establish a *prima facie* case because it did not present evidence that it substantially performed under the contract.

In response, Iron Horse argues that

"[Northwest's] directed verdict motion at trial came at the end of Iron Horse's case in chief and was not renewed at the

close of all the evidence. A motion for [JNOV] is proper only when the moving party has moved for directed verdict at the close of *all* the evidence, something [Northwest] neglected to do. ORCP 63 A; *Building Structures, Inc. v. Young,* 328 Or [100,] 112[, 968 P2d 1287 (1998)]."

(Emphasis in original.)

ORCP 63 A provides:

"When a motion for a directed verdict, *made at the close of all the evidence,* which should have been granted has been refused and a verdict is rendered against the applicant, the court may, on motion, render a [JNOV], or set aside any judgment which may have been entered and render another judgment, as the case may require."

(Emphasis added.)

■     In *Building Structures, Inc. v. Young,* 131 Or App 88, 94, 883 P2d 1308 (1994), *aff'd,* 328 Or 100, 968 P2d 1287 (1998), the

"[d]efendants made their motions [for a directed verdict on breach of contract and fraud claims] at the close of [the] plaintiff's case. Those motions were denied and defendants presented their evidence. They did not renew their motions for directed verdict at the close of all the evidence."

The Supreme Court held that, under ORCP 63 A, a motion for JNOV must "be preceded by the denial of a motion for directed verdict made *at the close of all the evidence.*" *Building Structures, Inc.,* 328 Or at 112 (emphasis added). Thus, Northwest did not perfect its motion for JNOV because it did not renew its motion for a directed verdict at the close of all the evidence.

■■     Furthermore, the denial of Northwest's motions for JNOV and a new trial are not reviewable. *Kraemer v. Harding,* 159 Or App 90, 104 n 9, 976 P2d 1160, *rev den,* 329 Or 357, 994 P2d 124 (1999) (denial of motions for JNOV and a new trial "made on the grounds of insufficency of evidence are not reviewable." (Internal quotation marks omitted.)); *Boers v. Payline Systems, Inc.,* 141 Or App 238, 247, 918 P2d 432 (1996), *rev den,* 325 Or 280, 936 P2d 987 (1997) ("As a general rule, a party may not assign the denial of a motion for new trial as error.").

■ We turn to the second half of Northwest's first assignment of error—that the trial court erred when it denied Northwest's motion for a directed verdict. "A directed verdict is appropriate when there is a complete absence of proof on an essential issue, or when there is no conflict in the evidence and it is susceptible of only one construction." *Monson v. State of Oregon*, 136 Or App 225, 231, 901 P2d 904 (1995). We reverse only if there is no evidence from which the jury could have found that Northwest breached the contract. *Id.*

In denying Northwest's motion for a directed verdict, the trial court stated:

"I am required to construe the evidence in favor of the plaintiff * * * and I have to give them every reasonable benefit of the doubt * * *.

"Because I think plaintiff is entitled to argue that even though there may have been some tentative agreement on the redline version of the confidentiality agreement, there still wasn't final agreement and Mr. Lucas, in fact, did not sign the confidentiality agreement. And I think plaintiff is entitled, based on the evidence in the case, at least to make the argument that Mr. Lucas probably would not have signed the kind of confidentiality agreement that would have satisfied plaintiff and Mr. Hofstetter.

"This is a really weird case * * * because of the * * * third party involvement of Mr. Hofstetter. * * * [I]t pretty clearly seems to me that he's the * * * sour grape in the bunch and his resistance and reluctance to part with the die is really what caused this whole deal to fall apart."

Northwest argues that, "[i]n order to survive [Northwest's] motion for directed verdict, Iron Horse needed to present evidence that it had substantially performed its contractual obligations, despite its failure to send the [little boot] tool." It cites *Wasserburger v. Amer. Sci. Chem.*, 267 Or 77, 82, 514 P2d 1097 (1973), where the Supreme Court noted:

"It is well established, at least as a general rule, that a plaintiff who seeks to recover under the terms of an express contract for defendant's failure to perform its terms must plead and prove his own substantial performance or a valid excuse for his failure to perform."

We conclude that there is evidence that Iron Horse had a valid excuse for failing to ensure that the little boot die was sent to Northwest for two reasons. First, the confidentiality agreement was never executed. The original contract, as it was outlined in the fax and agreed to by the parties, explicitly stated that there would need to be a confidentiality or technology share agreement among Montville, Northwest, and Iron Horse. In its second amended complaint, Iron Horse stated that

"[Northwest] * * * refused to enter into an acceptable confidentiality agreement with respect to the [little boot] die. Iron Horse thereafter refused to loan the [little boot] die to [Northwest] Rubber. Instead, Iron Horse offered to provide [Northwest] Rubber the [little] rail boot still needed for the job."

Northwest contends that a confidentiality agreement was reached between Lucas and Moorhead in Scott's office. However, we agree with the trial court that, when the evidence is viewed in the light most favorable to Iron Horse, the jury could find that the parties never entered into a confidentiality agreement and that Northwest breached the contract. In *Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 903 P2d 375 (1995), *adh'd to as modified on recons*, 138 Or App 428, 908 P2d 850 (1996), *rev den*, 324 Or 394, 927 P2d 600 (1996), the attorneys for the parties agreed on the essential terms of a settlement of an employment dispute. The terms of the settlement were then handwritten on a paper that the defendant accepted and that both attorneys signed. Subsequently, the defendant repudiated the settlement, and we held that, despite the fact that the defendant had not signed a written settlement agreement, the defendant's prior acts of acceptance were sufficient to bind the defendant to the settlement terms. This case is distinguishable because, on the cover sheet on the copy of the redlined agreement that Lucas faxed to Moorhead, Lucas wrote, "Here is a copy of the Redlined Draft Agreement we discussed today at Michael Scott's office." The copies of the agreement are also marked "DRAFT."

The second reason that a jury could have found that Iron Horse was excused from performing is that there was evidence that Iron Horse did not refuse to ship the die until it

discovered that Northwest had made its own little boot die. Northwest told Iron Horse that Northwest had made its own little boot die that it would be keeping for its own use. It was only at that point that Moorhead explicitly told Lucas that Iron Horse would not ensure shipment of the die. The jury thus could have found that Iron Horse was excused from its promise to ship the little boot die because, when Northwest made its own little boot die, it materially breached the contract. *Bennett Veneer Factors v. Tomco*, 256 Or 547, 550-51, 474 P2d 519 (1970) (stating that "we are convinced by the record that when plaintiff was unable to perform, defendant was justified in cancelling the agreement; that this was a material breach and excused performance by defendant").

■     Therefore, viewing the evidence in the light most favorable to Iron Horse, because the parties never had a confidentiality agreement and because Moorhead did not refuse to ensure the shipment of the die until Northwest had made its own die, we conclude that a jury could have found that Iron Horse had a valid excuse for its nonperformance and that Northwest breached the contract. Accordingly, the trial court did not err in denying Northwest's motion for a directed verdict.

■     Northwest's second assignment of error is that the trial court provided "a legally incorrect answer to the jury's written question during the jury's deliberations without first notifying counsel." In response, Iron Horse argues that that error was not preserved because Northwest had three opportunities to object but failed to do so. We do not have to resolve the issue of preservation or Northwest's second assignment of error on the merits because any error would be harmless. In a factually similar case, *State v. White*, 55 Or App 729, 732, 639 P2d 1291 (1982), we held:

> "The trial judge had no oral communication with the jury. He received a written question, delivered to him by the bailiff. The question was answered by delivering to the jury the written instruction. Following the verdict, the trial judge explained on the record the procedure he had followed. The question and the instruction are part of the record. Although it may have been a technical error to reinstruct the jury in counsels' absence, it was not a prejudicial error that requires a mistrial."

Furthermore, we conclude that the trial court's answer to the jury's question was, in this case, legally correct because the evidence was sufficient to find, as the jury did, that both parties breached the contract. *See Huntley v. Reed*, 276 Or 591, 594, 556 P2d 122 (1976) (stating that, in *Grammer v. Wiggins-Meyer Steamship Co.*, 126 Or 694, 703, 270 P 759 (1928), the Supreme Court had held that, even though it was error for the trial court to have instructed the jury on preparation of the verdict "in counsel's absence, such error was not sufficient to cause a reversal because the record showed the instruction to have been proper").

■       Northwest's third assignment of error is as follows:

"The trial court erred in denying [Northwest's] motion for judgment on the pleadings with respect to Iron Horse's claim of breach of the covenant of good faith and fair dealing, and in denying [Northwest's] motion for directed verdict and its motion for [JNOV] or for a new trial on the same issue."

We address the trial court's denial of Northwest's ORCP 21 B motion for judgment on the pleadings. Under *Curtis v. MRI Imaging Services II*, 327 Or 9, 16, 956 P2d 960 (1988), "[j]udgment on the pleadings is permissible only if the allegations, when taken in their entirety and viewed in the light most favorable to the plaintiff, affirmatively establish that the plaintiff has *no* claim. Our sole task is to determine whether plaintiff has pleaded *any* claim for relief." (Emphasis in original; citation omitted.) Here, then, our task is to determine whether Iron Horse has pleaded *any* claim for breach of the duty of good faith and fair dealing.

Northwest argues that

"the contract did not call for [Northwest] to make any tool at all. Because the covenant of good faith and fair dealing cannot be used to add terms to a contract, Iron Horse did not state a claim for relief and the trial court erred in denying [Northwest's] motion for judgment on the pleadings."

In response, Iron Horse argues that the fax memorialized only part of the contractual relationship between Iron Horse and Northwest, "but it is not an integration and does not purport to be. Even if it were, * * * nothing would bar the parties

from placing consistent additional terms, written or oral, into the contract." Iron Horse further argues that "industry custom and practice (hence the duty of good faith and fair dealing) imposed certain obligations on [Northwest] when it agreed to build the [big boot die]."

■     We agree with Iron Horse that the parties entered into agreements that are not discussed in the fax. It is irrelevant that the fax did not include the agreement that Northwest would make the big boot die. Northwest misunderstands Iron Horse's argument—Iron Horse's argument is not that the covenant of good faith and fair dealing added a term to the contract that Northwest make the big boot die in accordance with industry custom and practice. Rather, Iron Horse's argument is that a subsequent oral agreement was entered under which the parties agreed that Northwest would make the big boot die. There is evidence of the agreement both in testimony and in the May 12, 1999, fax from Northwest to Iron Horse in which Northwest thanked Iron Horse for meeting with Montville and states that the profile for the big boot die and the drawings are attached to the fax. It also asks Iron Horse for a quote on the tooling to produce the big boot. It further memorializes the agreement between Lucas and Moorhead that Northwest produce the boot for Stacy & Witbeck, as well as extra boot that Iron Horse can store in its inventory for future jobs that Northwest and Iron Horse had discussed working on together with the big boot die.[4]

■     We further agree with Iron Horse that the duty of good faith and fair dealing involves industry standards and practices that attach to agreements entered into by the parties. Although the contract does not fall under the Uniform Commercial Code because it concerns services and not goods, common-law contracts also include an implied covenant of good faith and fair dealing. *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 645, 891 P2d 639 (1995). In that case, the court explained:

---

[4] The parol evidence rule "only bars evidence of oral understandings and agreements made prior to or at the time of a written agreement and does not bar evidence of subsequent agreements or conduct by the parties." *Allen v. Allen*, 275 Or 471, 479, 551 P2d 459 (1976).

"That duty is to be applied in a manner that will effectuate the reasonable contractual expectations of the parties. But, it is only the objectively reasonable expectations of [the] parties that will be examined in determining whether the obligation of good faith has been met. * * * [T]he duty of good faith cannot serve to contradict an express contractual term[.]"

*Id.* (internal quotation marks, citations, and emphasis omitted).

Here, holding the parties to industry standards and practices effectuates the reasonable contractual expectations of the parties. The covenant of good faith and fair dealing is an implied covenant that both parties will refrain from any act that would "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" *Perkins v. Standard Oil Co.*, 235 Or 7, 16, 383 P2d 107, 383 P2d 1002 (1963) (quoting Corbin, 3 *Contracts* § 278 (1960)). Iron Horse alleges that Northwest acted dishonestly and that Northwest breached its duty of objective good faith. When viewed in the light most favorable to Iron Horse, its second claim for relief alleges that the parties had an established course of dealing that was consistent with industry standards and practices and that their course of dealing controlled the manner in which Iron Horse's designs for the die could be used by Northwest. Iron Horse further alleges that Northwest acted in a manner inconsistent with those industry standards and practices. Iron Horse alleges that Northwest did not disclose to Iron Horse its intent that Northwest was creating the die for its exclusive use and that it was not going to allow Iron Horse to pay for the die. Additionally, Iron Horse alleges that Northwest did not disclose to Iron Horse that Northwest intended to sell the die to Iron Horse's competitors. Iron Horse also alleges that Northwest intends to use the big boot die to produce boot for other jobs in the future. We therefore conclude that the trial court did not err in denying Northwest's motion for judgment on the pleadings because Iron Horse's complaint states a claim for breach of the duty of good faith and fair dealing.

For the same reasons, we conclude that the trial court did not err in denying Northwest's motion for a directed verdict on Iron Horse's claim for breach of the covenant of

good faith and fair dealing. Viewing the evidence in the light most favorable to Iron Horse, we hold that there is evidence from which the jury could have found that Northwest breached the covenant of good faith and fair dealing.

We also conclude, in accordance with our reasoning previously articulated in regard to Northwest's first assignment of error, that Northwest's motions for JNOV and a new trial on Iron Horse's claim for breach of the duty of good faith and fair dealing are not preserved. Here, as in Northwest's first assignment of error, Northwest did not perfect its motion for JNOV because it did not renew its motion for a directed verdict at the close of all the evidence.

▮ Finally, we turn to Northwest's fourth assignment of error. Northwest argues that the trial court erred when it denied Northwest's petition for attorney fees on Iron Horse's misappropriation of trade secrets claim. In its notice of appeal, Northwest indicated that it appealed, in part, from an order dismissing its petition for attorney fees. In *National Mortgage Co. v. Robert C. Wyatt, Inc.*, 154 Or App 306, 311, 961 P2d 894 (1998), *rev den*, 332 Or 430, 30 P3d 1183 (2001), we held that a "post-judgment determination of entitlement to attorney fees, which was memorialized in an order rather than a supplemental judgment, is not an appealable disposition." Thus, we dismiss the appeal to the extent that it was taken from the order and do not discuss Northwest's assignment of error further.

Appeal from amended opinion and order concerning attorney fees dismissed; otherwise affirmed.

# Appendix A

09 MAR 99

TO; JOE LUCAS, JR.

NORTHWEST RUBBER EXTRUDERS, INC.

BEAVERTON, OREGON

**SUBJECT:** STACY AND WTTBECK **CONTRACT ARRANGEMENT**

YOU HAVE NOW RECEIVED THE CORRECTED PURCHASE CONTRACT FROM STACY AND WITBECK, THE MAIN ITEMS OF WHICH ARE:

1)  47,500 LF OF 12333 RAIL BOOT FOR Ri52 RAIL @$17.15/LF = $814,625

2)  2785 EA STEEL TIES P/N 12286, COMPLETE, @ $92.95/EA = 258,865.75

3)  1700 LF 12.271 RAIL BOOT FOR Ri59 RAIL @ $17.15/LF = 29,155

ALL 3 ITEMS ARE QUOTED DELIVERED TO JOB SITE, COMPLETE WITH ALL ACCESSORIES.

THE ARRANGEMENT BETWEEN NWRE & IHECO GOES AS FOLLOWS

A)  S & W ISSUES P.O. TO NWRE FOR COMPLETE ORDER DONE!
B)  NWRE ISSUES A PO TO IHECO **FOR:**
    1)  20,000 LF 12333 RAIL BOOT @ 17.15 -10% = 15.44/LF NET
    2)  2785 EA STL TIES P/N 12286 @ 92.95 NET/EA
    3)  1651 LF 12.271 RAIL BOOT @ 17.15-10% = 15.44/LF NET
C)  NWRE ENTERS L\TO A CONTRACT WITH IHECO & MONTVILLE PLASTICS

    TO RENT THE EXTRUSION TOOLS & SHIPPING REELS, & TO PURCHASE

    THE ACCESSORY ITEMS (CUFFS, DUCT TAPE, SEALANT, ETC., TO

    COMPLETE THE DELIVERY OF THE 27,500 LF OF 12333 RAIL BOOT. THE

COMBINED RENTAL RATE & PURCHASE OF ACCESSORIES WILL BE 15.44-

9.25 = 6.19/LFNET

    ITEMS B2 & B3 ARE EITHER COMPLETE OR CONTINUE AS ABOVE IF NOT YET COMPLETE

D)  IHECO IS RESPONSIBLE FOR PAYING THE DELIVERY FREIGHT & RETURN FREIGHT & STORAGE CHARGES ON THE SHIPPING REELS.

E)  NWRE WILL RECEIVE THE FOLLOWING INCOME FROM THE CONTRACT:
    1)  20,000 LF @ $1.71 = $34200 NET
    2)  27,500 LF @ $10.96 = $301,400 NET LESS MFG COST OF 12333 BOOT

THAT PRETTY WELL SUMMARIZES IT, AS WE DISCUSSED ON THE PHONE. THERE WILL, OF COURSE, HAVE TO BE A CONFIDENTIALITY AGREEMENT/ TECHNOLOGY SHARE AGREEMENT. AMONG NWRE, IHECO & MONTVILLE. IF YOU SEE ANY HITCH IN THIS PLAN. LET ME KNOW RIGHT AWAY.

WITH BEST RGDS,

**BARRON, J. pro tempore,** concurring.

I agree with the majority's resolution of Northwest's first, third, and fourth assignments of error. In its second assignment of error, Northwest argues that the trial judge provided "a legally incorrect answer to the jury's written question during deliberations without first notifying counsel." Iron Horse argues that the error is not preserved,[1] but the majority finds it unnecessary to address the preservation issue because it finds harmless error based on *State v. White*, 55 Or App 729, 639 P2d 1291 (1982).[2] Although I agree with the majority that the error was harmless based on the circumstances present in this case, generally a trial judge communicating with a jury about issues in a case during deliberations, without the presence of or without making an attempt to notify counsel, is not harmless.

As the majority notes, after the jury in this case retired to deliberate, it submitted a written note to the trial judge. 193 Or App at 414. The judge responded in writing to the note, and his response to the note and the note were saved. He did not attempt to notify counsel and did not disclose the communication to the parties and counsel until after the jury was discharged and had dispersed.

ORCP 59 D states:

"After retirement for deliberation, if the jury requests information on any point of law, the judge may require the

---

[1] As pointed out by the majority, the trial judge did not notify the parties of his action until after the jury was discharged. When something occurs after a case is submitted and a party could not have reasonably foreseen the action, the matter should be considered on appeal. *See Ruckman v. Ormond*, 42 Or 209, 212, 70 P 707 (1902).

Further, disclosing the communication after the jury was discharged and had dispersed meant that, even if there had been error, it could not be corrected. Once a jury is discharged and has dispersed, the court loses control over the jury. *See State v. Vann*, 158 Or App 65, 73-74, 973 P2d 354 (1999).

[2] The quotation from *White* in the majority opinion refers to communicating with a jury as a "technical error." 193 Or App at 418 (quoting *White*, 55 Or App at 732). In *Grammer v. Wiggins-Meyer Steamship Co.*, 126 Or 694, 703, 270 P 759 (1928), a case similar to *White*, the phrase "technically erroneous" is used. A technical error is mechanical in nature, apparent on the face of the record, and does not involve the exercise of the judicial function. *City of Canby v. Rinkes*, 154 Or App 364, 370, 961 P2d 291 (1998). A judge communicating with a jury without the presence of counsel or without attempting to notify counsel is not a technical error.

officer having them in charge to conduct them into court. Upon the jury being brought into court, the information requested, if given, shall be given either orally or in writing in the presence of, or after notice to, the parties or their counsel."

In *Huntley v. Reed*, 276 Or 591, 556 P2d 122 (1976), the jury submitted a written question after it had began to deliberate. The trial judge answered the question in writing, but neither the note nor the answer was retained. On appeal, the plaintiff claimed that it was error for the trial judge to have instructed the jury out of the presence of and without notice to counsel. In discussing the claim, the Oregon Supreme Court noted that, "[t]he giving of the instruction in the above-described manner was in direct violation of [the predecessor statute to ORCP 59 D.]" *Huntley*, 276 Or at 593.[3]

*Huntley* points out the real problem with not following the dictates of ORCP 59 D. Because the note and answer to the note were not retained in *Huntley*, the judgment was reversed, even though the trial judge had stated, after the fact, what his recollection of the note and answer was. 276 Or at 594-95. The Supreme Court stated, "No one's memory should be the basis of the record of instructions given to a jury. The obvious purpose of the statute is to relieve parties from the very dilemma presented here." *Id.* To the same effect is *Hastings v. Top Cop Cut Feedlots, Inc.*, 285 Or 261, 263-64, 590 P2d 1210 (1979), in which the trial judge put his recollection of his oral answer to a written jury inquiry on the record after the fact but failed to make a record at the time that he actually answered the jury inquiry.

Although the trial judge in this case saved the jury's note and his response, notes can be lost, misplaced, or destroyed, and, more importantly, the procedure used by the

---

[3] The predecessor to ORCP 59 D, *former* ORS 17.325 (1975), *repealed by* Or Laws 1979, ch 284, § 199, provided:

"After the jury have retired for deliberation, if they desire to be informed of any point of law arising in the case, they may require the officer having them in charge to conduct them into court. Upon their being brought into court, the information required *shall be given in the presence of, or after notice to the parties or their attorneys.*"

(Emphasis added.) Thus, *Huntley* interpreted language nearly identical to that in ORCP 59 D.

judge meant that the parties were not given an opportunity to address the jury's question. When a jury requests further information during deliberations, the words from *Oien v. Bourassa*, 221 Or 359, 351 P2d 703 (1960), a case involving a communication between a bailiff and a jury, should be kept in mind. The court wrote that "[t]he sanctity of the jury and its freedom from outside influence must be jealously guarded by the court." *Id.* at 370. That admonition applies equally to a trial judge communicating with a jury without the presence of or without attempting to notify the parties or their counsel.[4]

I concur for the reasons stated above.

---

[4] That is not to say that parties or their counsel may not acquiesce, prior to deliberations, in a trial judge's stated intention to use discretion in determining whether to notify them of jury inquiries. *See Beall Transport Equipment Co. v. Southern Pacific*, 170 Or App 336, 357, 357 n 15, 13 P3d 130 (2000), *rev'd and rem'd on other grounds*, 335 Or 130, 60 P3d 530 (2002).