Argued and submitted June 10, 2004, affirmed on appeal and on cross-appeal
March 15, 2006

Rick E. MILLER,
*Respondent - Cross-Appellant,*

*v.*

PACIFIC TRAWLERS, INC.,
an Oregon corporation,
*Appellant - Cross Respondent,*

*and*

F/V CAPE FOULWEATHER,
a vessel,
*Defendant.*

0103-02176; A118909

131 P3d 821

Lisa E. Lear argued the cause for appellant - cross-respondent. With her on the briefs were Jess B. Millikan and Bullivant Houser Bailey PC.

David N. Goulder argued the cause for respondent - cross-appellant. With him on the briefs were Jeffrey S. Mutnick, Robert B. Hopkins, and Landye Bennett Blumstein LLP.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

LINDER, J.

## LINDER, J.

Plaintiff was involved in an accident in which he suffered serious permanent injury to both of his legs. As a result of that accident, plaintiff filed an action under the federal Jones Act, 46 USC app section 688(a), against his former employer, defendant Pacific Trawlers, Inc., alleging negligence.[1] After a trial, the jury returned a verdict in plaintiff's favor, although it also found that plaintiff was four percent at fault for his injuries. Defendant now appeals; plaintiff, in turn, cross-appeals. For the reasons explained below, we affirm on both the appeal and the cross-appeal.

### I. BACKGROUND

Defendant Pacific Trawlers is an Oregon corporation engaged in the fishing business. Defendant owns and operates one vessel—the Cape Foulweather. Plaintiff had been employed by Pacific Trawlers for over 10 years before the accident in question, eventually becoming captain of the Cape Foulweather.

The Cape Foulweather is used to fish for both groundfish and shrimp. As a result, different equipment must be installed on the boat depending on the type of fish intended to be caught. To fish for shrimp, large, steel-framed "doors" must be moved out of a storage area located a few hundred yards from the dock and installed on the boat. Each door, built specifically for dragging the ship's nets through the water for shrimp fishing, is approximately 8' x 9' and weighs approximately 1,500 pounds.[2] A 12-foot-long rope, referred to as a "lifting strap," is permanently affixed to the

---

[1] Plaintiff also asserted an "unseaworthiness" claim against the vessel F/V Cape Foulweather. The parties stipulated to the dismissal of that claim. Accordingly, the claim of unseaworthiness against the Cape Foulweather is not at issue on appeal, and all references to defendant are to Pacific Trawlers.

[2] With few exceptions, shrimp are caught with trawls, which are winged nets that form a cone-like shape in the middle that tapers to a narrow end, called the cod-end. The two "wings" of a trawl are attached to wooden or metal "doors." Lines run from the shrimp boat to each door. As the shrimp boat tows the trawl over the sea bottom, the trawl is held open by the kite-like spreading action of the doors. Indeed, they are called doors because their function is to open the mouth of the net. Shrimp and bottom fish scooped into the open trawl pile up in the cod-end. When the net is boated, a line that holds the cod-end closed is released and the catch falls to the deck.

top of the door for lifting and lowering the door between the water and the vessel deck.

Typically, boom trucks are used to transport the doors from the storage area to the ship. Plaintiff had previously worked with Dennis Cutting, the president of Pacific Trawlers, using a forklift—rather than a boom truck—to move the steel doors. It was Cutting's practice to slide the forks of the forklift through the slats in the top of the doors and then to transport the doors in an upright, hanging position. When transporting the doors in that manner, the only way that the operator of the forklift can see is by peering through the gaps in the slats, which greatly diminishes visibility.

On the day of the accident, plaintiff, with the assistance of William Brooks, the captain of another vessel owned by one of Cutting's other corporations, was attempting to move several of the large, steel-framed doors to the Cape Foulweather for installation. Because no boom trucks were available, plaintiff used a forklift to move the doors. The first three doors were moved without incident. But the last door to be moved from storage ended up flat in the mud, with its weighted end nearest the forklift. To pull the door upright so that it could be "speared" by the forklift, plaintiff tied the lifting strap to the forklift. The lifting strap remained tied to the forklift while Brooks moved it. After leaning that door against the other doors, and without untying the lifting strap, Brooks, who was driving the forklift, suddenly backed up, pulling the door down onto plaintiff as he was walking away from the door.

The force of the door knocked plaintiff to the ground, face first. The impact shattered plaintiff's right knee, "exploded" his right femur through the skin of his leg, and crushed the nerves of both legs. During the four years immediately after the accident, plaintiff underwent seven surgeries in an attempt to repair the damage. As a result of those numerous attempts to stabilize his leg using screws and metal plates, plaintiff has approximately 44 holes in the bone of his right leg. Plaintiff's right leg is now two inches shorter

than his left, causing degenerative back changes and additional pain. It is possible that plaintiff could ultimately require an above-the-knee amputation.

## II. DISCUSSION

On appeal, defendant raises five assignments of error, three of which we address. First, defendant argues that the trial court erred in denying its motion for a change of venue. Second, defendant argues that the trial court erred in denying its motion to strike the testimony of David Rollins, plaintiff's expert who testified about plaintiff's lost future earnings. Closely related to that argument is defendant's third assignment of error, that the trial court erred in denying its motion for a directed verdict on plaintiff's claim for lost future earnings.[3] On cross-appeal, plaintiff contends that the trial court erred by reducing the jury's damage award based on plaintiff's four percent comparative fault. For the reasons explained below, we affirm the trial court in all respects.

A. *Defendant's motion to change venue*

■ Plaintiff filed his complaint in Multnomah County. Before filing an answer, defendant moved, pursuant to ORS 14.110(1)(a) and (c), for a change of venue from Multnomah County to Coos County. ORS 14.080—a catch-all provision that applies when venue is not governed by other sections—provides, in part:

"(1) All other actions shall be commenced in the county in which the defendants, or one of them, reside *at the commencement of the action* or in the county where the cause of action arose. * * *

"(2) For purposes of this section, a corporation incorporated under the laws of this state * * * shall be deemed to be a resident of any county where the corporation * * * conducts *regular, sustained business activity* * * *."

---

[3] Defendant's fourth assignment of error is that the trial court erred in instructing the jury that, in deciding whether defendant was negligent, the jury may consider the relationship between a shipowner and its seamen, and the obligation of a seaman to obey the orders of a superior. Defendant's fifth assignment of error challenges the trial court's denial of its motion for remittitur. We reject both assignments of error without discussion.

(Emphasis added.) In support of its motion, defendant filed a memorandum of law, supported by two affidavits. Plaintiff opposed the motion by producing extensive evidentiary documentation demonstrating that, at least from approximately 1993 until 1999, defendant sold most, if not all, of its catch to a single buyer located in Multnomah County. Although the buyer took delivery of the fish in Coos County, the business records for that time period indicate that there were a significant number of communications and contacts between the buyer in Multnomah County and defendant in Coos County. Both parties focused their arguments on whether those communications and contacts constituted "regular, sustained business activity" for purposes of ORS 14.080. Virtually no evidence was submitted by either party concerning defendant's activities as of February 28, 2001, when the action commenced, which is the relevant time frame for establishing residency under the statute.

After a hearing, the trial court denied defendant's motion. The trial court reasoned that defendant had conducted regular, sustained business activity in Multnomah County and was, therefore, a resident of Multnomah County for purposes of venue. In response to that ruling, defendant petitioned the Oregon Supreme Court for writ of mandamus that would order the trial court to transfer venue from Multnomah County to Coos County. In its petition, defendant explained why mandamus was the appropriate remedy:

"Ordinary appellate review cannot provide a plain, speedy, and adequate remedy in the ordinary course of law as it is difficult, if not impossible, to demonstrate that a trial court's refusal to grant a change of venue has prejudiced the moving party. The Supreme Court has previously ruled in several cases that mandamus is an appropriate method of seeking review of a circuit court's ruling on a motion to change venue."

The Supreme Court denied the petition, and the case proceeded to trial. The jury awarded plaintiff $4 million in compensatory damages, but, as discussed later, the trial court reduced that amount based on the jury's finding that four percent of the damages were caused by plaintiff's comparative negligence.

Defendant advances two principal arguments in support of its contention that the trial court erred in denying its motion for a change of venue. First, defendant argues that the evidence fails to demonstrate that defendant conducted sustained and regular business in Multnomah County at the relevant time—that is, when the complaint was filed. Second, defendant argues that, even if the issue could be resolved based on defendant's communications and contacts between 1993 and 1999, those communications do not, as a matter of law, constitute "regular, sustained business activity" within the meaning of ORS 14.080(2). Thus, defendant asserts, under ORS 14.080, venue was proper only in Coos County.

Plaintiff responds with a number of arguments, only one of which we need to address, as it is dispositive. Plaintiff asserts that "the only way to challenge an allegedly erroneous non-discretionary venue decision is by mandamus." According to plaintiff, because defendant sought and was denied mandamus relief, we cannot address the issue on direct appeal. As we explain, we agree.

Mandamus is an extraordinary remedy. As the Oregon Supreme Court has explained, "[i]n general, [the Supreme Court] issues a writ of mandamus only when there is no plain, speedy, and adequate remedy in the ordinary course of the law." *State ex rel Carlile v. Frost*, 326 Or 607, 611, 956 P2d 202 (1998). Thus, ordinarily the Supreme Court will not entertain a mandamus proceeding if the matter can be adequately addressed on appeal. *Id.* And, the court has held, "[d]irect appeal is an adequate remedy unless the relator would suffer a special loss beyond the burden of litigation by being forced to trial." *State ex rel Automotive Emporium v. Murchison*, 289 Or 265, 269, 611 P2d 1169 (1980). For a few discrete types of rulings, however, the Supreme Court has determined that appeal is never an adequate remedy and has held that a petition for a writ of mandamus is the only way in which a party may challenge a trial court's action.

Trial court decisions regarding venue—at least those that are based on legal, rather than discretionary, determinations—are among those discrete types of rulings. In *Mack Trucks, Inc. v. Taylor*, 227 Or 376, 382, 362 P2d 364 (1961),

the Supreme Court explained that, when the plaintiff chooses an "improper" place for trial,

> "the defendant's only remedy is a motion for change of venue. If the court rules against him and he wishes to pursue the matter further, he *must* then proceed by mandamus in this court to force the trial court to change the venue. Although the statutes leave the matter in some doubt, we construe them as providing the same procedure for raising the issue of improper venue in both actions at law and suits in equity."

(Emphasis added.) The court consistently has applied that holding. In *Roskop v. Trent*, 250 Or 397, 400, 443 P2d 174 (1968), for example, the Supreme Court refused to consider on direct appeal "an assignment [of error] which challenge[d] the trial court's refusal to allow a change of venue" because "the remedy for an erroneous refusal to change the venue is by way of mandamus * * *."[4] In *Lee v. Brown*, 264 Or 341, 345, 505 P2d 924, *cert den*, 414 US 830 (1973), the court noted, "Plaintiff correctly contends that the remedy for an erroneous refusal to grant a change of venue is by way of petition for writ of mandamus." More recently, in *State ex rel LeVasseur v. Merten*, 297 Or 577, 580, 686 P2d 366 (1984), the court explained, "Our decisions reflect that an exception to [the rule that direct appeal is an adequate remedy unless the relator would suffer a special loss beyond the burden of litigation by being forced to trial] exists where the court below may * * * be an improper venue for trial."[5]

---

[4] Our court has done the same. In *Reagan v. Certified Realty Co.*, 47 Or App 35, 37, 613 P2d 1075, *rev den*, 289 Or 741 (1980), we rejected the defendants' claim of error regarding venue without reaching its merits. Our explanation, in its entirety, was as follows:

> "In their first assignment of error, the defendants contend that the trial court erred in denying their motion for change of venue. In order to challenge an erroneous refusal to grant a change of venue a party must proceed by way of petition for writ of mandamus. The defendant failed to follow the proper procedure; this assignment fails."

(Citations omitted.)

[5] The Supreme Court has issued writs of mandamus in a number of other venue cases in which it apparently assumed that mandamus was the appropriate remedy, although it did not explicitly address the issue. *See, e.g., State ex rel Stephens v. Londer*, 311 Or 385, 811 P2d 1375 (1991); *Rose v. Etling*, 255 Or 395, 467 P2d 633 (1970); *International Trans. v. Bohannon*, 252 Or 356, 449 P2d 847 (1969); *U'Ren v. Bagley*, 118 Or 77, 245 P 1074 (1926). *See generally* C. P. Jhong, Annotation, *Prohibition or Mandamus as Appropriate Remedy to Review Ruling on Change of Venue in Civil Case*, 93 ALR 2d 802 (1964).

■ Consistently with the general principle that mandamus is not available to control judicial discretion,[6] mandamus is not an available remedy when a trial court's venue ruling involves an element of discretion. Thus, for example, if a trial court grants a change of venue based on a discretionary determination that jurors in a particular county are "so prejudiced" against the moving party as to preclude a fair trial, mandamus will not lie to review that ruling. *See State ex rel Douglas County v. Sanders*, 294 Or 195, 198 n 6, 201 n 10, 655 P2d 175 (1982) (mandamus is not available to review decisions based on discretionary considerations). But, by contrast, if a trial court's venue ruling is based on the purely legal determination that all jurors of a particular county are *per se* prejudiced against the moving party because the action is one in which the moving party seeks to impose liability on the county in which those jurors reside, mandamus is the only appropriate procedural route to review that purely legal determination. *Id.* at 198, 201.

■ The line that the Supreme Court has drawn fits within its mandamus jurisprudence in other contexts. ORS 14.080 reflects a legislative judgment about the appropriate forum for the trial of broad categories of cases, rather than a judgment directed to case-specific considerations that bear on a fair forum in which to conduct a particular trial. The statute thus reflects systemic considerations, presumably ones involving concerns such as convenience to parties and witnesses and the appropriate distribution of judicial resources throughout the state. For systemic legislative choices of that kind, direct appeal after trial generally is not an adequate remedy. *See, e.g., State ex rel Anderson v. Miller*, 320 Or 316, 323, 882 P2d 1109 (1994) (discovery procedures that exist for systemic rather than case-specific reasons are appropriate for mandamus because of the unlikelihood of demonstrating prejudice in any particular case). In other words, there is no adequate remedy for a party forced to litigate in the "wrong" county.[7] Unlike the possibility of a retrial

---

[6] *See State ex rel Roach v. Roth*, 293 Or 636, 638-41, 652 P2d 779 (1982).

[7] In *Henderson v. Smith*, 282 Or 109, 577 P2d 504 (1978), the Supreme Court held that a person charged in municipal court with a state traffic offense had the right to be notified of his option to remove the case to district court, that the municipal court judge had no discretion in that regard, and that mandamus was

when venue is improper because, for example, the residents of the county are so prejudiced against the party seeking a change of venue that the party cannot receive an impartial trial, a new trial in another county would add injury to what was only insult arising from the trial in the "wrong" county. The new trial in the "correct" county would burden the parties, the witnesses, and judicial resources twice, rather than cure some unfairness in the original trial. Said another way, a new trial would force the parties and witnesses to endure a second trial and require another county's courts to duplicate the expenditure of judicial resources on it, under circumstances where there is no basis to believe that the outcome of the trial would be any different. For that reason, direct appeal is not an adequate remedy for a mistake in venue that is based on a legal error.[8]

We return, then, to this case. The trial court denied the motion for a change of venue because it determined that defendant was a resident of Multnomah County for venue purposes. That was a purely legal determination; that is, once the facts were established, the trial court's task was to apply the law to determine whether defendant was or was not a resident of the county in which the complaint was filed. In this case, that involved construing what constitutes "regular, sustained business activity." ORS 14.080(2). After the trial court denied the motion for a change in venue, defendant sought and was denied a writ of mandamus from the Supreme Court. That was the proper remedy for defendant to pursue. We therefore will not now consider on direct appeal defendant's arguments regarding the trial court's refusal to change venue to Coos County. *Roskop*, 250 Or at 400; *Reagan v. Certified Realty Co.*, 47 Or App 35, 37, 613 P2d 1075, *rev den*, 289 Or 741 (1980).

---

appropriate to enforce the defendant's right. Regarding the latter point, the court explained, "It is irrelevant whether [the defendant in the underlying action] could have had an appeal and a *de novo* trial from a municipal court conviction. We also see no reason to require [him] to submit to a trial and then appeal before the municipal court's error can be corrected." *Id.* at 114.

[8] Indeed, on appeal, among his other arguments in response to defendant's challenge to the venue ruling, plaintiff urges that defendant is not able to demonstrate prejudice sufficient to warrant a new trial. Defendant's only response to that argument (which is inconsistent with its mandamus petition in which it asserted that there was no adequate remedy in the ordinary course) is that a violation of the statute is *per se* prejudicial.

B. *Defendant's challenges to plaintiff's evidence of lost future earnings*

At the close of plaintiff's case-in-chief, defendant made two motions challenging the calculation, determination, and proof of the portion of plaintiff's damages related to the loss of future earnings. The first was a motion to strike the testimony of plaintiff's economics expert, Rollins. The second was a motion for a partial directed verdict. In support of the two motions, defendant made a combined argument that, on various theories, urged that the calculation of lost future earnings by Rollins was legally insufficient and could not support an award of those damages for plaintiff. After the trial court heard argument from both parties, it addressed defendant's directed verdict motion, ultimately ruling, "I'm going to deny the motion for a directed verdict."

■■ We decline to consider defendant's challenge to the denial of its motion to strike, for two reasons. First, the motion was not timely; it was made at the end of plaintiff's case-in-chief rather than contemporaneously with Rollins' testimony. *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 390, 879 P2d 1288 (1994), *rev dismissed*, 321 Or 511 (1995) ("A motion to strike is untimely, unless it is made as soon as the ground for the motion [is] disclosed." (Internal quotation marks omitted.)). Second, defendant did not secure a ruling on the motion. The trial court did not expressly rule on it, and defendant, in response to the ruling on the motion for a partial directed verdict, did not seek an express ruling on the motion to strike. *See VTech Communications, Inc. v. Robert Half, Inc.*, 190 Or App 81, 90-91, 77 P3d 1154 (2003), *rev dismissed*, 337 Or 547 (2004) (refusing to address claim that trial court erred in denying motion to dismiss when trial court never ruled on the motion). We therefore consider defendant's arguments only in connection with the trial court's denial of defendant's motion for a partial directed verdict.

In support of its motion for a partial directed verdict, defendant challenged the legal adequacy of Rollins's testimony to support an award of lost future income. Defendant made two principal arguments in support of the motion, both of which it renews on appeal. First, defendant argues that the

factual foundation for Rollins's testimony was lacking, because the record does not support Rollins's calculations of plaintiff's expected annual salary or his assumption as to how long plaintiff would have worked as a fishing boat captain. Second, defendant argues that Rollins's method of calculating plaintiff's lost future income was legally flawed. In that regard, defendant makes two related subarguments. Specifically, defendant urges that federal law required Rollins to base his expert opinion on predictions of plaintiff's gross income, rather than plaintiff's net income (*i.e.*, income after taxes and business expenses). Relatedly, defendant also urges that, under federal law regarding proof of damages, plaintiff was required to present expert testimony of the present value of plaintiff's future lost income and that plaintiff failed to do so, at least in a legally sufficient way, through Rollins, who was plaintiff's only expert on lost future income.

■■ On appeal, our standard of review is well settled. A directed verdict is appropriate only when there is "a complete absence of proof on an essential issue, or when there is no conflict in the evidence and it is susceptible of only one construction." *Monson v. State of Oregon*, 136 Or App 225, 231, 901 P2d 904, *rev den*, 322 Or 361 (1995) (citing *Denley v. Mutual of Omaha*, 251 Or 333, 336, 445 P2d 505 (1968)). In reviewing the denial of a motion for a directed verdict, we consider the evidence, including any inferences, in the light most favorable to the party that obtained a favorable verdict; the verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary" to support it. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *see Vandermay v. Clayton*, 328 Or 646, 648, 984 P2d 272 (1999) (same).

1. *The factual foundation for Rollins's opinion*

Defendant's first argument challenging the denial of its motion for a partial directed verdict is that Rollins's opinion as to plaintiff's lost future wages was based on assumptions that have no factual support in the record. In particular, defendant asserts that there was no factual basis for Rollins to assume that plaintiff would earn $60,000 a year until his retirement, instead of the $55,000 a year that he had earned during some of the years immediately before his injury.

Defendant also asserts that Rollins had no factual basis to conclude that plaintiff would continue to work as the captain of a fishing boat until he reached age 65. In response, plaintiff points to evidence that plaintiff, in future years, would earn at least $60,000 annually, and possibly more, and that plaintiff could and would work into his mid-60s, and possibly beyond.

We will not belabor the evidence or competing inferences on which the parties respectively rely. Defendant's arguments ultimately invite us to weigh the quality of plaintiff's evidence and to determine what inferences most persuasively should be drawn from it. That invitation is not consistent with the standard by which we review the trial court's ruling. Suffice it to say that, having examined the record in full and consistently with our standard of review, we conclude that the factual assumptions underlying Rollins's opinion regarding plaintiff's future annual salary and his longevity as a fishing boat captain are amply supported by the record. The trial court correctly so concluded and correctly denied defendant's motion insofar as it was based on that ground.

2. *The calculation of plaintiff's lost future income*

That leaves defendant's second principal argument for why the trial court should have directed a verdict in its favor on plaintiff's lost future income damages—*viz.*, that Rollins's calculation was legally insufficient as a matter of federal law. In that regard, as we earlier described, defendant makes two subarguments: (1) Rollins did not reduce plaintiff's lost future income to reflect net income after taxes and business expenses, and (2) Rollins did not reduce plaintiff's expected future income to its present value using a legally sufficient methodology. As a threshold matter, we agree with defendant that we appropriately look to federal law in determining the legal adequacy of plaintiff's proof of damages.[9] We disagree, however, that plaintiff's proof was

---

[9] As we later describe, the Jones Act, 46 USC app section 688(a), incorporates the Federal Employers' Liability Act (FELA), 45 USC section 51 *et seq. See American Dredging Co. v. Miller*, 510 US 443, 456, 114 S Ct 981, 127 L Ed 2d 285 (1994) (so observing). Damage determinations in Jones Act cases therefore present a question of substantive federal law. *Ches. & Ohio Ry. v. Kelly*, 241 US 485, 491, 36 S Ct 630, 60 L Ed 1117 (1916) ("[T]he question of the proper measure of damages

legally insufficient under the applicable federal legal standards.

 In support of its first subargument, defendant asserts that, "[u]nder federal law, plaintiff could recover only *net* income after reductions for state and federal income taxes and unreimbursed business expenses." (Emphasis in original.) Defendant then takes issue with plaintiff's proof because plaintiff's expert—Rollins—did not deduct taxes and business expenses from his projections for plaintiff's lost future *gross* income. The problem with defendant's argument, however, is that it confuses what a plaintiff's expert witness must do with what the jury must do. To be sure, federal law provides that proof of taxes and business expenses are "relevant" in calculating a plaintiff's lost future income. *Norfolk & Western R. Co. v. Liepelt*, 444 US 490, 493-94, 100 S Ct 755, 62 L Ed 2d 689 (1980). But defendant cites no authority for the proposition that a plaintiff's *prima facie* case is legally insufficient if it is based only on gross income rather than net income. To the contrary, the authorities on which defendant relies hold only that a defendant generally (but not always) is entitled to put on proof of taxes and other liabilities as factors for a jury to consider in calculating an award of future damages. *See, e.g., id.* at 494, 494 n 7 (as a rule, a defendant is entitled to present evidence of taxes and other liabilities that would reduce a plaintiff's future wages, but such evidence can be excluded where its effect on an award would be *de minimis* and it could "cause more confusion than it is worth"). Those authorities also stand for the proposition that a defendant is entitled to a proper instruction on the jury's role in reducing the award. *Id.* at 498 (because personal injury award was not taxable, defendant was entitled to have jury instructed not to consider taxes in fixing the amount of the award).

Here, nothing prevented defendant from presenting proof of factors that the jury could have considered in reducing an award of lost future income based on taxes, business

---

is inseparably connected with the right of action, and in cases arising under the Federal Employers' Liability Act it must be settled according to general principles of law as administered in the Federal courts."); *see Monessen Southwestern R. Co. v. Morgan*, 486 US 330, 335, 108 S Ct 1837, 100 L Ed 2d 349 (1988) ("State courts are required to apply federal substantive law in adjudicating FELA claims.").

expenses, or any other relevant liabilities. Moreover, defendant requested, and the trial court gave, an instruction that advised the jury to award plaintiff only *net* future income.[10] Under federal law, no more was required in that regard.

■ Nor did federal law require more of plaintiff's proof in calculating the present value of plaintiff's future income. Defendant's argument to the contrary is constructed from three propositions: (1) federal law requires a jury to reduce an award of lost future income to present value; (2) a plaintiff has the burden to present expert testimony from which the jury may do so; and (3) Rollins's method of calculating the present value of plaintiff's lost future income was legally erroneous. We have no quarrel with the first proposition. *See Monessen Southwestern R. Co. v. Morgan*, 486 US 330, 339, 108 S Ct 1837, 100 L Ed 2d 349 (1988) (The Court has "consistently recognized that damages awards in suits governed by federal law should be based on present value." (Internal quotation marks omitted.)). But we believe that the better view, under federal law, is that a jury can reduce an award to present value without expert evidence. We also conclude that plaintiff did not put legally flawed evidence before the jury in this case.

To date, neither the United States Supreme Court, the Oregon Supreme Court, nor this court has issued an authoritative pronouncement as to whether, in a federal action seeking damages based on future losses, a plaintiff is required to produce expert evidence of the present value of such an award.[11] As its only authority so holding, defendant

---

[10] Specifically, the jury was instructed:

"Any award made to [plaintiff] in this case for past or future lost earnings is not subject to federal or state income tax. Therefore, in computing the amount of any damages to which you may find [plaintiff] is entitled to recover for lost earnings, he is entitled to recover only the net, after-tax income. In other words, [plaintiff] is entitled to recover only take-home pay which you may find he has lost in the past or will lose in the future."

[11] Contrary to plaintiff's assertion, neither this court nor the Oregon Supreme Court has directly addressed the question under federal law. In *Brokenshire v. Rivas and Rivas, Ltd.*, 142 Or App 555, 563-64, 922 P2d 696 (1996), *rev dismissed*, 327 Or 119 (1998), a state-law products liability case, we stated that expert testimony on how to compute present value, and on the various assumptions involved in the computation, would have been admissible, but was not necessary. In support of that proposition, we cited *Plourd v. Southern Pac. Transp. Co.*, 266 Or 666, 676-79, 513 P2d 1140 (1973), a FELA case. In *Plourd*, however, the court held only that a

relies on a line of cases from the Third Circuit Court of Appeals that stand for the proposition that, in a damages action controlled by federal law, "the plaintiff bears the burden of producing evidence from which the trier of fact may make a rational reduction to present value of a lost earnings award[.]" *Gorniak v. National R.R. Passenger Corp.*, 889 F2d 481, 486 (3d Cir 1989) (reiterating a statement made in earlier cases).

Other federal courts, however, have uniformly held to the contrary. In *Heater v. Chesapeake and Ohio Railway Company*, 497 F2d 1243, 1249-50 (7th Cir), *cert den*, 419 US 1013 (1974), for example, the Seventh Circuit acknowledged the Third Circuit's view that a plaintiff must produce expert evidence on reducing an award of future damages to present value. But the Seventh Circuit disagreed with the Third Circuit, stating that the court could not "accept such a dismal evaluation of the capabilities of the average juror." *Id.* at 1250. In *Duncan v. St. Louis-San Francisco Railway Company*, 480 F2d 79, 87 (8th Cir), *cert den*, 414 US 859 (1973), the Eighth Circuit similarly rejected the Third Circuit's approach. It adopted instead the Sixth Circuit's more long-standing holding that "a jury, unaided by specific testimony as to money values, could themselves, being told that the award should be only money value, properly apply the applicable rule." *Pennsylvania Railroad Company v. McKinley*, 288 F2d 262, 265 (6th Cir 1961). As the Fifth Circuit summed up the state of the law in the federal appellate courts:

"[T]he Third Circuit seems to stand alone in making either expert, actuarial evidence concerning the present value of future loss or mathematical guidance on the method of reducing gross loss to present value prerequisite to the submission of loss of future wages to the jury. The Sixth, Seventh and Eighth Circuits have all rejected this approach."

jury must be *instructed* to reduce awards of future earnings to present value. *Id.* at 672-73. In passing, the court observed that "the practice of calling expert witnesses by either party for this purpose may be the most reliable method of presenting these issues to a jury." *Id.* at 676. But the court was not required to decide and did not decide whether a plaintiff has a burden to present such evidence to avoid a directed verdict for the defendant on a claim for future damages.

*Bonura v. Sea Land Service, Inc.*, 505 F2d 665, 668-69 (5th Cir 1974). The Fifth Circuit, too, thus rejected the Third Circuit's isolated holding that a plaintiff has a burden to present evidence of present value before a jury can perform its role in reducing a damage award of future losses to present value. *Id.* at 669.

 Although this court is not bound by the interpretation of federal law by federal courts of appeal, *Page v. Palmateer*, 336 Or 379, 390, 84 P3d 133, *cert den*, 543 US 866 (2004), we see no reason to depart from the reasoning expressed by the Fifth, Sixth, Seventh, and Eighth Circuits. *See State v. Kell*, 303 Or 89, 95, 734 P2d 334 (1987) ("[T]here is no value in being different merely for the sake of the difference."). It represents the clear weight of authority and, in our opinion, the better view. Indeed, it is the same rule that we apply in actions brought under state law. *See Brokenshire v. Rivas and Rivas, Ltd.*, 142 Or App 555, 563-64, 922 P2d 696 (1996), *rev dismissed*, 327 Or 119 (1998) (expert testimony on computing present value of damage award for future losses is admissible, but not necessary). We therefore follow the lead of the majority of federal circuits and hold that plaintiff was not required in this case to produce expert testimony of the present value of his lost future income.

 The remaining question is whether, although plaintiff had no burden to produce affirmative evidence of the present value of his lost future income, he nevertheless did so using a legally impermissible calculation.[12] In his testimony at trial, Rollins explained to the jury that, in determining plaintiff's lost future income, he used what is commonly referred to as the "total offset" method of calculation. The total offset method of calculation assumes that the rate of future inflation (*i.e.*, wage inflation) and future interest rates (*i.e.*, price inflation) will effectively cancel, or offset, each other. Thus, the total offset method of calculating future

---

[12] Arguably, our analysis could end without reaching this question. If Rollins used an impermissible calculation to determine present value, the appropriate way to challenge his testimony was through a motion to strike. As earlier noted, although defendant made that motion, it was untimely, and the trial court never ruled on it. We go on to consider the merits of defendant's argument in the context of its motion for a partial directed verdict, however, because it appears that the trial court reached and resolved the argument in that procedural context.

income assumes that earnings growth exactly offsets cost of living increases and that, therefore, the future value of income is the same as present value.

Defendant argues that the Supreme Court has rejected the total offset method as a legally unacceptable methodology for calculating present value. A careful reading of the case on which defendant relies, *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 US 523, 103 S Ct 2541, 76 L Ed 2d 768 (1983), however, does not support that conclusion.

In *Pfeifer*, the Supreme Court discussed at length the three major approaches that courts had taken in calculating present value: (1) simply adopting a below-market discount rate, *see, e.g., Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F2d 30, 39-40 (2d Cir 1980), *cert den*, 451 US 971 (1981); (2) relying on market interest rates while permitting evidence of future price inflation, *see, e.g., Bach v. Penn Central Transportation Co.*, 502 F2d 1117, 1122 (6th Cir 1974); and (3) applying the "total offset" method, *see, e.g., Beaulieu v. Elliott*, 434 P2d 665, 670-72 (Alaska 1967). *Pfeifer*, 462 US at 541-44. After highlighting the relative benefits and drawbacks of each approach, the Court specifically declined to "establish" one method over another "as the exclusive method in all federal trials for calculating an award for lost earnings in an inflationary economy." *Id.* at 546. Said another way, the Court was not willing to adopt any one methodology as a "mandatory federal rule of decision," which the trial court had done and which had "colored the trial court's evaluation of the relevant evidence" as a result. *Id.* at 551. Contrary to defendant's position, the Supreme Court did not reject the total offset method as an acceptable method of calculation of present value; it rejected it only as a *federally mandated* method that precluded evidence of any other methodology.[13]

---

[13] Indeed, with respect to the offset method, the Court observed that the method had the "virtue of simplicity and may even be economically precise." *Pfeifer*, 462 US at 550. The Court did not endorse it as legally required, however, because the court did not believe sufficient data permitted it to determine how closely economic reality would bear out the offset method or any other particular methodology of calculating present value. *Id.* at 550-51. The Court therefore concluded that, if there were to be a federally mandated single method of calculation, the legislative branch of government, not the Court, should devise it. *Id.* at 551.

Nothing in *Pfeifer* suggests any error in the jury's consideration of plaintiff's evidence of present value in this case. The jury was given a correct charge on its role in determining present value. At defendant's request, the jury was told:

> "If you decide that [plaintiff] is entitled to prevail and you find that he will have a future loss of earnings because of his injury, then it becomes your duty to reduce that future loss to its present value. This is necessary because [plaintiff] will be compensated now for future losses.

> "To find present value, you must decide the amount of money which, if invested today at a reasonable rate of interest, will return to [plaintiff] over the period of his future loss the same amount he would have earned had he not been injured."

Thus, although the trial court instructed the jury that it must reduce the value of any award to present value, the jury was not instructed that the total offset method of calculating present value was legally mandated. As a result, Rollins's testimony was evidence for the jury to consider and for it to weigh as it chose. Accordingly, the trial court did not err in denying defendant's motion for a directed verdict on plaintiff's claim for lost future earnings on the ground that Rollins's method of calculating present value was flawed as a matter of law.

## C. *The cross-appeal: plaintiff's comparative negligence*

Plaintiff's cross-appeal presents a single issue: whether defendant was barred from raising plaintiff's comparative negligence as a partial defense. The issue arises because, as we describe in greater detail below, under the Jones Act, which incorporates the provisions of Federal Employers' Liability Act (FELA), 45 USC section 51 *et seq.*, an employer generally may raise comparative negligence as a partial defense unless the employer's own negligence involved violation of a safety statute. Here, plaintiff presented evidence that defendant violated several regulations, promulgated pursuant to the Occupational Safety and Health Act (OSHA), 29 USC section 655, that contributed to his injury. The trial court, in turn, instructed the jury that it could find defendant negligent on the basis of those OSHA violations. Over plaintiff's objection, however, the trial court

permitted the jury to consider whether plaintiff's own negligence contributed to his injury. When the jury found plaintiff to have been four percent negligent, the trial court reduced the jury's total damages award by that percentage. On cross-appeal, plaintiff argues that the trial court erred in that regard.[14]

So framed, the more narrow question presented is whether OSHA violations trigger the bar to comparative negligence under FELA and, derivatively, under the Jones Act. To provide context for our analysis, we begin with a description of the pertinent provisions of the Jones Act, FELA, and OSHA. We then examine the holdings of the federal courts, which are split on whether an employer's OSHA violation bars consideration of a worker's own negligence in causing his or her injury. As we explain, the overwhelming weight of federal authority is contrary to plaintiff's position and provides, we conclude, the better-reasoned analysis.

 ██ Congress enacted the Jones Act in 1920 to govern seamen's personal injury claims against their employers. The act is, in effect, a form of workers' compensation law, one that is specific to the shipping industry. *Kernan v. American Dredging Co.*, 355 US 426, 432, 78 S Ct 394, 2 L Ed 2d 382 (1958). Like workers' compensation laws more generally, the Jones Act embodies a congressional recognition that the shipping industry has "a special responsibility toward[s] [its] workers, who [a]re daily exposed to the risks of the business and who [a]re largely helpless to provide adequately for their own safety." *Id.* at 431.[15] Although the overall intent was "to provide liberal recovery for injured workers," the Jones Act is written in only "the most general terms." *Id.* at 432. It sets forth few substantive provisions governing recovery for workplace injuries in the shipping industry, leaving it instead to

---

[14] Defendant asserts that we do not have jurisdiction over plaintiff's cross-appeal. We reject that argument without discussion.

[15] As the Supreme Court more recently has explained, under traditional maritime law, a seaman who fell sick or was injured in the course of his work was entitled to be cared for and to be paid wages and could receive damages for injuries caused by the unseaworthiness of the ship. But a seaman was barred from bringing an action against the shipowner for its general negligence. The Jones Act was enacted to remove that bar. *Stewart v. Dutra Contr. Co.*, 543 US 481, 487, 125 S Ct 1118, 160 L Ed 2d 932 (2005) (citing authorities).

the courts to "fashion[ ] remedies for injured employees in a matter analogous to the development of tort remedies at common law." *Id.*[16]

██ ██ The one way in which the Jones Act does provide some specific terms governing an injured worker's recovery is by incorporating the provisions of FELA, which was enacted approximately 12 years before the Jones Act, in 1908, to govern personal injury claims in the railroad industry. To liberalize personal injury recoveries for railroad workers, FELA relaxes the traditional tort standard of causation and eliminates certain defenses to an employer's liability. *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F3d 432, 436 (4th Cir 1999). Of importance to this case, FELA specifically abolishes the common-law defense of contributory negligence, which fully barred an employee's recovery if his or her own negligence contributed in any way to the injury. FELA instead provides for a comparative negligence defense as follows:

> "In all actions * * * brought against any such common carrier * * * to recover damages for personal injuries to an employee, * * * the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee[.]"

45 USC § 53. Thus, as a general rule, in FELA and, accordingly, also Jones Act cases, an injured worker's own negligence results in a reduction of any award of damages against the employer to the extent that the worker's own negligence contributed to the injury.[17]

---

[16] The Jones Act, 46 USC app section 688(a), provides, in part:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply."

[17] "Comparative negligence" is the proper description for the defense asserted in this case, although the parties (and courts) tend to use the terms "comparative negligence" and "contributory negligence" interchangeably. Contributory negligence is a common-law defense that completely bars recovery if a plaintiff is negligent at all. Comparative negligence (also referred to as "comparative fault"), in contrast, is a partial defense that requires the jury to allocate the plaintiff's and the defendant's relative fault in assessing damages. *See Sandford v. Chev. Div. Gen. Motors*, 292 Or 590, 624, 642 P2d 624 (1982) (Peterson, J., concurring) ("The

But FELA goes on to provide an exception to that general rule by stating, immediately after the above provision:

> *"Provided,* That no such employee who may be injured * * * shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury * * * of such employee."

*Id.* (emphasis in original). In other words, if the employer's negligence involved violation of a safety statute, the employer is barred from relying on a defense of comparative negligence and is responsible for all damages arising out of the injury, without an offset for the worker's own negligence.[18]

The parties do not dispute that the jury could have found from the evidence that defendant violated OSHA regulations.[19] Thus, the pivotal question is whether OSHA is a "statute enacted for the safety of employees," for purposes of FELA and, derivatively, the Jones Act. That inquiry, in turn, is complicated by an OSHA provision, 29 USC section 653(b)(4), that states in part that OSHA shall not be construed "to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries * * * arising out of, or in the course of, employment." Framed another way, the more narrow question presented on

---

doctrine of comparative negligence intends to avoid the harsh result of the common law contributory negligence rule that any negligence by the plaintiff, however small, barred recovery.").

[18] As federal courts consistently recognize, the phrase "contributory negligence" in the context of that portion of FELA refers to what is correctly termed "comparative negligence." Federal courts therefore refer to the provision as barring the defense of comparative negligence. *See, e.g., Kopczynski v. The Jacqueline,* 742 F2d 555, 558 (9th Cir 1984), *cert den,* 471 US 1136 (1985) (FELA's reference to contributory negligence is "more appropriately in today's terms, comparative negligence"). We do the same.

[19] Pursuant to OSHA, the steel doors used for trawling are to be stored lying flat, not upright. *See, e.g.,* 29 CFR § 1910.176(b) (2005) ("Storage of material shall not create a hazard."). More generally, 29 USC section 654(a) provides that an employer must furnish employment and a workplace that "are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees," and that the employer must "comply with occupational safety and health standards promulgated under this chapter."

plaintiff's cross-appeal is whether—taking into account the "enlarge or diminish or affect" language from OSHA—a provision of OSHA constitutes a "safety statute" for the purposes of FELA, thus barring a reduction in damages based on comparative fault.

The United States Supreme Court has yet to address the question. Several federal appellate courts, however, have grappled with it and with the related question of whether an employer's OSHA violation can be used as negligence *per se*— that is, to establish the employer's liability as a matter of law, rather than merely as evidence of the employer's negligence. Although the federal courts are divided, the majority rule is that OSHA violations cannot be used in FELA/Jones Act actions either to bar a defense of comparative negligence or to establish an employer's negligence as a matter of law.

The majority rule reflects two rationales. First, the courts following that rule have concluded that OSHA regulations are not the kind of safety regulations that trigger FELA's exemption from the general rule of comparative negligence. Second, and usually additionally, those courts have determined that the "enlarge or diminish or affect" language of OSHA precludes use of its provisions to establish an employer's negligence as a *per se* matter or to bar an otherwise available defense of comparative negligence. The few courts that have reached a contrary conclusion have done so on the theory that FELA's language barring comparative negligence for an employer's violation of a safety statute is broad and admits of no exceptions. In their arguments on appeal, the parties essentially invite us to determine which side of the split of authority is better reasoned. We therefore examine in greater detail the lead federal cases on both sides of the issue.

*Jones v. Spentonbush-Red Star Co.*, 155 F3d 587 (2d Cir 1998), is the case that most closely resembles this one. In *Jones*, as here, the seaman plaintiff brought a Jones Act action against his employer. At trial, the relevant OSHA regulation was read to the jury, and the jury was told that it could consider the regulation in determining whether the defendant had been negligent. *Id.* at 594. The jury was instructed on comparative negligence and ultimately

assigned the plaintiff 25 percent of the fault for his injury. The damages award was reduced accordingly. *Id.* at 591. As here, the plaintiff argued that OSHA "precludes a comparative fault analysis." *Id.* at 594.

Focusing on the "enlarge or diminish or affect" wording in OSHA, the Second Circuit explained that "the plain effect of a bar to comparative negligence would be to 'affect, if not enlarge the employer's liability.' " *Id.* at 596 (quoting *Ries v. National R.R. Passenger Corp.*, 960 F2d 1156, 1162 (3d Cir 1992)) (some internal quotation marks omitted). That is, according to the Second Circuit, if a jury were not allowed to reduce the damages in accordance with a plaintiff's proportion of fault, it would "enlarge" the employer's liability, contrary to the dictate of section 653(b)(4).

The Second Circuit acknowledged that the Ninth Circuit reached the opposite conclusion in *Fuszek v. Royal King Fisheries, Inc.*, 98 F3d 514 (9th Cir 1996), *cert den*, 520 US 1155 (1997), a case involving the effect of a Coast Guard regulation on the availability of a comparative negligence defense under FELA and the Jones Act. *Jones*, 155 F3d at 595. The court also recognized that the Supreme Court of the United States had held that FELA "afford[s] seamen all the rights granted to railroad workers," including "a bar against comparative negligence for violations of statutes enacted for the safety of employees." *Id.* (citing *Kernan*, 355 US at 439). But the Second Circuit distinguished *Kernan* and *Fuszek* on the ground that those cases involved Coast Guard regulations, which are statutes aimed specifically at shipping activities. OSHA, the court pointed out, is a "general workplace safety regulation." *Id.* The court reasoned:

> "Unlike Coast Guard regulations and maritime statutes that are specifically aimed at shipping activities, Jones relies on a general workplace safety regulation to attain the same results in a maritime context. We do not think it was Congress' purpose for [OSHA] to have such an all-encompassing effect."

*Id.* Accordingly, the court held in *Jones* that a defendant's violation of an OSHA regulation is not a bar to a finding of comparative negligence. *Id.* at 596.[20]

---

[20] The Ninth Circuit in *Fuszek* likewise distinguished Coast Guard regulations from OSHA regulations and intimated that the bar to a comparative negligence

The Third Circuit reached a similar conclusion in *Ries*. In that railroad injury case, the court focused first on FELA, rather than on OSHA, as the Second Circuit had. The court quoted the portion of FELA that precludes application of comparative negligence if the employer violates a "statute enacted for the safety of employees" and then asked "whether an OSHA regulation is the type of safety statute whose violation would trigger the provisions of FELA." *Ries*, 960 F2d at 1159. The Third Circuit equated the question whether a violation of an OSHA regulation establishes negligence *per se* under FELA with whether such a violation bars consideration of an employee's comparative negligence.[21] Reasoning that the language of FELA referring to a "statute enacted for the safety of employees" could not be construed in isolation, the court turned to the "enlarge or diminish or affect" provision of OSHA.

The Third Circuit had little trouble concluding that the plain language of OSHA is dispositive:

> "Section 653(b)(4) clearly states that OSHA shall not 'enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees.' If a violation of an OSHA regulation could constitute negligence *per se* and bar contributory negligence under the FELA, it would be almost axiomatic that the effect would be to 'enlarge or diminish or affect' the statutory duty or liability of the employer. * * * Had Congress intended such a result, it would not have drafted section 653(b)(4) in such sweeping terms."

*Id.* at 1162. "[I]t is clear to this court," the Third Circuit concluded, "that Congress did not intend for a violation of an OSHA regulation to * * * bar contributory negligence under

---

defense under FELA would not have applied if the case had involved the defendant's violation of an OSHA provision. 98 F3d at 517.

[21] As our discussion suggests, many of the cases in which this issue has arisen have also involved the related question whether a violation of an OSHA regulation constitutes negligence *per se*. That related question is not presented by this case, however. Although the trial court, out of the jury's presence, opined that defendant had violated OSHA "as a matter of law," the jury was not given a negligence *per se* instruction. That is, the jury was not instructed that defendant had violated OSHA. Nor was it instructed that, if it found that defendant had violated OSHA, defendant was negligent as a matter of law. Instead, the jury was told only that it could use the relevant OSHA regulations as evidence of the standard of care that defendant owed to plaintiff.

the FELA." *Id.* Other federal courts, including the Ninth Circuit Court of Appeals, implicitly or explicitly have reached that same conclusion.[22]

 To support his contrary position, plaintiff relies on a number of decisions from federal and state courts, only three of which involved the narrow question presented here and seem sufficiently on point to merit discussion. In *Cook v. Ancich*, 119 F Supp 2d 1118 (WD Wash 2000), the federal district court reached a conclusion opposite to that of the authorities discussed above. In so doing, the court relied solely on the "statute enacted for the safety of employees" language in FELA and concluded summarily that OSHA regulations are such statutes. *Id.* at 1120. The court neither considered nor acknowledged the "enlarge or diminish or affect" wording in OSHA. *See id.* at 1119-20. In *Watterson v. Mallard Bay Drilling, Inc.*, 649 So2d 431, 437 (La App 1994), *writ den*, 650 So2d 241 (La 1995), *cert den*, 515 US 1118 (1998), also relied on by plaintiff, the court recognized the holding in *Ries*, but simply "disagree[d] with that holding," and provided no explanation of its disagreement, beyond its reliance on the contrary authority provided by *Pratico v. Portland Terminal Co.*, 783 F2d 255 (1st Cir 1985). Because the opinion in neither case provides independent reasoning or rationale for us to examine, we turn to an explanation of the decision in *Pratico*.

 In *Pratico*, the First Circuit was presented with a situation in which a railroad worker had been injured by the "railroad's use of equipment in violation of OSHA regulations." *Id.* at 257. The injured employee's damages award had been reduced by 80 percent, the amount by which the jury

---

[22] *See, e.g., Robertson v. Burlington Northern R. Co.*, 32 F3d 408 (9th Cir 1994) (FELA case; violation of OSHA regulation is not negligence *per se*; reduction of award because of four percent comparative fault affirmed without discussion); *Albrecht v. Baltimore & Ohio R. Co.*, 808 F2d 329 (4th Cir 1987) (FELA case; violation of OSHA regulation is not negligence *per se*; statement in *dicta* that issue of comparative negligence should be submitted to jury); *Minichello v. U.S. Industries, Inc.*, 756 F2d 26, 29 (6th Cir 1985) (in product liability case, "OSHA regulations can never provide a basis for liability because Congress has specified that they should not"); *Bertholf v. Burlington Northern Railroad*, 402 F Supp 171, 173 (ED Wash 1975) ("[B]y the express terms of OSHA, violation of regulations under that act would not affect plaintiff's recovery under FELA," and comparative negligence applies.).

had found him to be comparatively negligent. *Id.* On appeal, the injured employee argued that the railroad's violation of an OSHA regulation both constituted negligence *per se* and eliminated a comparative negligence defense.

The court examined the legislative history behind section 653(b)(4) and determined that the "intent of the provision was merely to ensure that OSHA was not read to create a private right of action for injured workers which would allow them to bypass the otherwise exclusive remedy of worker's compensation." 783 F2d at 266. The court reasoned that the "doctrine of negligence per se does not have the effect of turning reasonable, nontortious behavior into unreasonable, tortious behavior." *Id.* at 265. Rather, according to the First Circuit, the doctrine of negligence *per se* "simply allows the presence of a statutory regulation to serve as irrefutable evidence that particular conduct is unreasonable." *Id.* Furthermore, "allowing OSHA regulations to be given effect in other statutory or common law actions is not the same as allowing the regulations, standing alone, to create new actions." *Id.* at 268. Thus, the First Circuit concluded, violations of OSHA constitute negligence *per se* and bar comparative negligence under FELA.

The court's opinion in *Pratico* has been criticized for overlooking the obvious, plain meaning of the text of section 653(b)(4). Exemplary of the decisions criticizing *Pratico* is *Ries*, in which the Third Circuit pointed out that the First Circuit's legislative history analysis was based on a letter from a nonlegislator that was not even "included in the official published version of OSHA's legislative history." *Ries,* 960 F2d at 1161-62, 1162 n 4. Moreover, the *Ries* court explained, the First Circuit's reliance on the letter "defies traditional principles of statutory interpretation which dictate that courts first look at the statute's language and the plain meaning of that language." *Id.* at 1161.

Equally as important, the First Circuit itself has criticized *Pratico* and has suggested that, when the right occasion arises, it may overrule it. In *Elliott v. S.D. Warren Co.,* 134 F3d 1, 4-5 (1st Cir 1998), the First Circuit characterized its holding in *Pratico* as "of questionable validity" and

noted that, when it decided *Pratico*, it "had very little guidance from [its] sister circuits." The court did not overrule *Pratico*, however, because it concluded that, for "present purposes, it suffices to note that *Pratico* involved a FELA claim and the case's holding is properly limited to causes of action brought under that statute." *Elliott*, 134 F3d at 4. More recently, in a Jones Act case, a district court in the First Circuit took the "hint in *Elliott*" and held that an OSHA violation is neither a basis for negligence *per se* nor a bar to a defense of contributory negligence. *Falconer v. Penn Maritime, Inc.*, 397 F Supp 2d 68, 73-75 (D Me 2005). Thus, not only has every other federal circuit considering the question reached a result opposite of what the First Circuit reached in *Pratico*, but the First Circuit seems primed to do so as well.

█ To be sure, we are not bound by the views of federal courts of appeals. But, in this case, we agree with the weight of federal authority, and we consider the criticisms of the *Pratico* case well-founded. *See Shaw v. PACC Health Plan, Inc.*, 322 Or 392, 402 n 8, 908 P2d 308 (1995) ("When the federal courts are well-settled on a specific interpretation, this court may choose to follow that interpretation, if the underlying reasoning is persuasive. However, federal court decisions, other than those issued by the Supreme Court, are not binding on this court.").[23] In this case, if FELA and OSHA were interpreted to bar comparative negligence, it would have the effect of expanding defendant's liability from $3,833,480.74 to $4,000,000.00, a difference of $166,519.26. As the majority of federal courts have explained, that result runs counter to the plain language of the OSHA statute, which states, in part, that nothing in OSHA shall be construed as "to *enlarge* or diminish or affect in any other manner the * * * *liabilities* of employers." 29 USC § 653(b)(4) (emphasis added). To reach the opposite conclusion would require that we ignore the plain language of the statute.

---

[23] The fact that the Ninth Circuit appears to be in accord with the weight of federal authority, 204 Or App at 608-09 n 20, 610 n 22, is also a factor for us to consider. Although not bound by federal decisions from the Ninth Circuit, Oregon courts often give particular weight to those decisions because Oregon lies in that circuit. *E.g., Van De Hey v. U.S. National Bank*, 102 Or App 203, 206-07, 793 P2d 1388 (1990), *aff'd*, 313 Or 86, 829 P2d 695 (1992).

Accordingly, the trial court did not err when it reduced plaintiff's award by four percent.

## III. CONCLUSION

In conclusion, defendant's challenge to the trial court's failure to grant its motion to strike the testimony of plaintiff's expert, Rollins, is not properly raised on appeal. Nor do we find merit to defendant's arguments relating to the denial of its partial motion for directed verdict, which challenge the legal adequacy of Rollins's testimony to support the jury's award of lost future income. In particular, we conclude that there is ample evidence in the record to support Rollins's assumptions as to plaintiff's future salary and longevity as a fishing boat captain. Further, we conclude that plaintiff did not have a burden to present expert evidence of the present value of plaintiff's future damages. Nor did the total offset method that Rollins used to calculate present value place a legally impermissible calculation before the jury. Finally, the trial court appropriately submitted the issue of plaintiff's comparative negligence to the jury and properly reduced plaintiff's award by the four percent comparative fault that the jury attributed to him.

Affirmed on appeal and on cross-appeal.